MAYFAIR MINERALS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket ·No. 5409–68.   Filed April 15, 1971.

*R. B. Cannon*, for the petitioner.
*Arthur B. Bleecher* and *Dennis J. Carlin*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for its taxable year ending September 30, 1961, in the amount of $785,736.90, and for its taxable year ending September 30, 1963, in the amount of $59,998.63. The only issue presented for decision is whether petitioner realized taxable income in its fiscal year ending September 30, 1961, when it canceled an account payable representing contingent liabilities for customer refunds erroneously deducted as accrued liabilities for its fiscal years ending September 30, 1957, through September 30, 1960.[1]

### FINDINGS OF FACT

Mayfair Minerals, Inc. (hereinafter petitioner), is a corporation chartered under the laws of Texas which had its principal office at McAllen, Tex., at the time its petition was filed. It employed the accrual method of accounting and a fiscal year ending September 30.[2] For the years in controversy, petitioner filed its income tax returns with the district director of internal revenue, Austin, Tex.

Prior to 1954, petitioner was engaged, through Delhi-Taylor Oil Corp., in producing natural gas and selling it to pipeline corporations. The gas sales involved in this proceeding were all made to Trunkline Gas Co. (hereinafter Trunkline).

Petitioner and Trunkline negotiated a new contract, effective November 30, 1954, in which the rate to be paid for gas was increased from approximately 7½ to 12 cents per thousand cubic feet, MCF. They then applied to the Federal Power Commission (hereinafter

---

[1] Respondent has conceded that there is no deficiency for the year ending Sept. 30, 1963.
[2] For the sake of simplicity, petitioner's fiscal years will usually be described by referring to the calendar year in which the particular fiscal year ends.

FPC) for approval of the new 12-cent rate. The FPC declined to approve the rate increase, and, on December 29, 1954, suspended it. On March 1, 1955, petitioner filed with the FPC an agreement to refund to Trunkline any difference between 12 cents per MCF and such rate as the FPC might eventualy approve, plus 6-percent interest thereon. Thereafter, petitioner collected from Trunkline and reported on its returns as depletable income the full 12 cents per MCF for the gas which it sold.

By an order dated September 30, 1957, the FPC disallowed the increase in price and ordered petitioner to refund the amount collected in excess of 7½ cents per MCF. The amount of the refund so ordered, including interest, was $2,023,756.88.

Petitioner filed a petition with the FPC for a rehearing, and the petition was denied on November 27, 1957. However, the FPC granted an application for a stay of its order, pending review by the Court of Appeals for the Fifth Circuit. Subsequently, upon a joint motion of the parties, the Court of Appeals remanded the case to the FPC for further consideration. Intermittent pleadings, investigations, and hearings followed, terminating in an order entered by the FPC on October 11, 1960. This order, in effect, approved the rate increase and became final on or about November 10, 1960.

During the period from March 1, 1955, through September 30, 1960, while petitioner was contesting the FPC's disapproval of the rate increase but selling its gas at the increased rate, it made the following liability accruals on its books, charging them to an account payable:

| Year | Net total for year | Accumulated total |
| --- | --- | --- |
| 1955 | $468, 580. 51 | $468, 580. 50 |
| 1956 | 797, 397. 25 | 1, 265, 977. 75 |
| 1957 | 757, 779. 13 | 2, 023, 756. 88 |
| 1958 | 776, 719. 81 | 2, 800, 476. 69 |
| 1959 | 755, 068. 07 | 3, 555, 544. 76 |
| 1960 | 719, 581. 39 | 4, 275, 126. 15 |

On its income tax return for 1957, the year in which the FPC ordered the refund, petitioner deducted an item listed on a schedule of "Income and Deductions" and a "Refund as ordered by FPC." The amount deducted ($2,023,756.88) was the amount shown on the above table as the "Accumulated total" for that year. On its returns for the following years, 1958, 1959, and 1960, petitioner deducted the amounts shown on the above tables as "Net total for year." These items were labeled as "Refund as ordered by FPC," in the 1958 return, and as "Refund as ordered by the FPC," in the 1959 and 1960 returns. None of these accrued liabilities were ever paid.

From the time it became apparent that petitioner would not be required to refund the amounts attributable to the rate increase, the treatment to be accorded these items for income tax purposes was a matter of discussion among petitioner's officers and tax advisers. Three possible courses of action were considered: (1) Filing amended returns for 1957 through 1960, recomputing the income for each year without the benefit of the accrued liabilities and paying the resulting tax; (2) reporting the full amount of $4,275,126.15 as income for 1961; and (3) doing neither (1) nor (2), but making an entry in Schedule M, part of the 1961 return, reflecting that the previously accrued liabilities had been canceled.

A senior tax partner in the Houston office of a national accounting firm, after consulting with a senior tax partner in the New York office of that firm, advised petitioner that the amount of the canceled liability should be reported as income in petitioner's return for 1961.

Petitioner's own tax adviser disagreed with the advice of the accounting firm. Under date of December 6, 1961, he addressed a letter to petitioner's president, containing an analysis of possible courses of action. The letter advised that petitioner (1) should not file amended returns for 1957 through 1960, (2) should not include the $4,275,126.15 in 1961 taxable income, but (3) should file a return for 1961, making a "disclosure" of the recision of the FPC order in Schedule M of the return. The letter further stated that, in the opinion of the writer, section 1.461–1 (a) (3), Income Tax Regs., relating to amended returns, is "invalid, merely precatory, or both."

Pursuant to the recommendation of its tax adviser, petitioner consulted an attorney in private practice. In a letter dated December 15, 1961, the attorney advised that "the net taxable income of Mayfair Minerals, Inc. for its fiscal year ended September 30, 1961 was not affected in any way by the recision by FPC of its 1957 order directing the payment of refunds," adding:

May I suggest that, in my view, a proper manner of communicating the recision of the order of the FPC to the Internal Revenue Service would be through the medium of Schedule M of the 1961 income tax return in which Schedule the restoration to surplus of all accrued accounts payable based on the original FPC order should be shown with the explanation in substance that the amounts were restored to surplus because of the recision of the original order of the FPC.

Petitioner did not file amended income tax returns for 1957 through 1960, and did not report for 1961 any income as a result of the cancellation of its contingent liability to make rate refunds to Trunkline. At the direction of its tax adviser, Schedule M of petitioner's income tax return for 1961 contained the following:

MAYFAIR MINERALS, INC.

RECONCILIATION OF TAXABLE INCOME AND ANALYSIS OF CHANGES IN SURPLUS

For Calendar Year 1961

Or Fiscal Year Beginning October 1, 1960, and Ending September 30, 1961

Net change in surplus:
  Increases:
    Taxable income before net operating loss deduction and special deductions (loss)_____ ($45,161.36)
    Other:
      Depletion allowable for tax purposes_____ 622,503.34
      Intangible development costs incurred in the fiscal year_____ 538,983.36
      Future lifting costs applicable to production payments which paid out_____ 50,000.00
      Order by FPC for refund of portion of prior years gas sales rescinded—
        contingent liability therefor eliminated_____ $4,275,126.15
    Less: Applied directly to reserve for amortization of
            intangible development costs_____ $3,665,126.15
          Applied to creation of reserve for taxes and interest_  610,000.00    4,275,126.15_____

                                                                              1,166,325.34

The Schedule M adjustment to the reserve for amortization of intangible development costs is completely unrelated to the contingent rate refund liability. The former reflects the writeoff for business accounting purposes of the intangible development costs which had been previously deducted for income tax purposes. The reserve for taxes and interest represents the amount of additional taxes and interest that would have been owed if amended returns had been filed for 1958, 1959, and 1960, without claiming deductions for the disputed rate increase refunds. At the time the 1961 return was filed, the assessment of a deficiency for 1957 was already barred by the statute of limitations.

Petitioner's returns for 1957 through 1961 were filed on the following dates:

| Years | Date of filing |
|---|---|
| 1957 | Mar. 5, 1958 |
| 1958 | Mar. 9, 1959 |
| 1959 | Mar. 17, 1960[1] |
| 1960 | Dec. 13, 1960 |
| 1961 | Feb. 23, 1962 |

[1] Estimated date since the date of receipt is not indicated on the copy of the return in evidence.

Because petitioner had assets in excess of $1 million, each of these returns was reviewed in the office of the Internal Revenue Service to ascertain whether the return would be audited. The returns for 1957 through 1960 were accepted as filed, were marked "Closed on Survey," and were not audited. The return for 1961 was examined and audited, and a notice of deficiency was issued on October 30, 1968.

The notice of deficiency stated, in part:

(e) As a result of rate hearings before the Federal Power Commission (FPC), Docket No. G–6504, and an agreement and undertaking you filed on or about May 9, 1955, with the FPC to comply with the terms and conditions of the FPC

order making effective proposed rate changes, you accrued and deducted under your method of accounting, as a result of an order of the FPC, refunds of $4,275,126.15 due your customer in the fiscal years ended on or before September 30, 1960.

It is determined that you realized under your method of accounting taxable income of $4,275,126.15 in the fiscal year ended September 30, 1961, when your liability to make such refunds under the written agreement and undertaking on file with the FPC was terminated or canceled.

It is further determined that, in any event, you are estopped from claiming that taxable income did not result on the elimination of your liability of $4,275,126.15.

OPINION

Petitioner contends that each of its taxable years must be considered separately. Respondent's only recourse for imposing a tax on the disputed income, petitioner argues in substance, was to disallow the deductions for 1957 through 1960. As to 1961, petitioner maintains that it realized no taxable income when the FPC order was rescinded, and that, consequently, respondent's determination is erroneous. We do not agree.

As a general rule, each taxable period is to be treated as separate and independent, and items of income and deductions for one year may not be set off and adjusted in computing the tax for another year. *Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359 (1931). Yet there are situations where the proper treatment of an item in one year cannot be resolved without reference to events in a prior year. See, e.g., *Dobson* v. *Commissioner*, 320 U.S. 489 (1943), rehearing denied 321 U.S. 231 (1944). One of these situations arises when an amount deducted from gross income in one year is recovered in a later year; in such circumstances, the tax-benefit rule requires that the amount of the recovery be taxed as income in the later year. See, e.g., *Merchants Nat. Bank* v. *Commissioner*, 199 F. 2d 657, 659 (C.A. 5, 1952), affirming 14 T.C. 1375 (1950); *Putnam Nat. Bank* v. *Commissioner*, 50 F. 2d 158 (C.A. 5, 1931), affirming 20 B.T.A. 45 (1930). The reason for this rule is clear. "When recovery or some other event which is inconsistent with what has been done in the past occurs, adjustment must be made in reporting income for the year in which the change occurs. No other system would be practical in view of the statute of limitations, the obvious administrative difficulties involved, and the lack of finality in income tax liability, which would result." *Estate of William H. Block*, 39 B.T.A. 338, 341 (1939), affirmed sub nom. *Union Trust Co.* v. *Commissioner*, 111 F. 2d 60 (C.A. 7, 1940), certiorari denied 311 US. 658 (1940).

While the tax-benefit rule had its genesis in court decisions, it is now implicitly codified in section 111,[3] relating to recovery exclusions. *West Seattle National Bank of Seattle* v. *Commissioner*, 288 F. 2d 47, 48–49 (C.A. 9, 1961), affirming 33 T.C. 341 (1959). This section assumes the efficacy of the rule by providing for the exclusion from gross income of any amount attributable to the recovery of a previously deducted bad debt, prior tax, or delinquency amount to the extent the deduction in the prior year did not result in a tax benefit to the taxpayer.

The regulations extend similar treatment to "all other losses, expenditures, and accruals made the basis of deductions from gross income for prior taxable years." Sec. 1.111–1(a), Income Tax Regs. Thus, the rule applies to accrued but unpaid deductions as well as to deductions actually paid. The adjustment for such an unpaid expense is made in the year in which the liability for the item is extinguished.

Under this rule, petitioner, having received the prior tax benefits from the accrued deductions, realized income in 1961. In that year, its contingent liability to make the refunds terminated, the account payable was closed, and the money which the accruals represented became available for its general use. *Bear Manufacturing Co.* v. *United States*, 430 F. 2d 152 (C.A. 7, 1970), certiorari denied 400 U.S. 1021 (1971); *Wichita Coca Cola Bottling Co.* v. *United States*, 152 F. 2d 6 (C.A. 5, 1945); *Sneed* v. *Commissioner*, 119 F. 2d 767, 771 (C.A. 5, 1941), affirming 40 B.T.A. 1136 (1939), certiorari denied sub nom. *Thompson* v. *Helvering*, 314 U.S. 686 (1941); *Commissioner* v. *Dallas Title & Guar. Co.*, 119 F. 2d 211 (C.A. 5, 1941), modifying 40 B.T.A. 1022 (1939).

Petitioner seeks to avoid inclusion of the previously deducted accruals in its 1961 income on the ground that the transaction falls within one of the exceptions to the tax-benefit rule. First, it points to the line of authority exemplified by *Streckfus Steamers, Inc.*, 19 T.C. 1 (1952),

---

[3] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

SEC. 111. RECOVERY OF BAD DEBTS, PRIOR TAXES, AND DELINQUENCY AMOUNTS.

(a) GENERAL RULE.—Gross income does not include income attributable to the recovery during the taxable year of a bad debt, prior tax, or delinquency amount, to the extent of the amount of the recovery exclusion with respect to such debt, tax, or amount.

(b) DEFINITIONS.—For purposes of subsection (a)—

\*     \*     \*     \*     \*     \*     \*

(4) RECOVERY EXCLUSION.—The term "recovery exclusion," with respect to a bad debt, prior tax, or delinquency amount, means the amount, determined in accordance with regulations prescribed by the Secretary or his delegate, of the deductions or credits allowed, on account of such bad debt, prior tax, or delinquency amount, which did not result in a reduction of the taxpayer's tax under this subtitle \* \* \*

acq. 1953–1 C.B. 6, and *Adolph B. Canelo III*, 53 T.C. 217, 226–227 (1969), acq. 1971–1 C. B. 2, to the effect that the tax-benefit rule does not apply where the original deduction was improper; in such cases, the Commissioner's only remedy ordinarily is to disallow the erroneous deduction. Referring then to *Dixie Pine Co.* v. *Commissioner*, 320 U.S. 516 (1944), and *Security Mills Co.* v. *Comm'r.*, 321 U.S. 281 (1944), for the proposition that contingent liabilities are not properly deductible, petitioner contends that the tax-benefit rule cannot be applied in this case.

We think, however, that the manner in which petitioner handled this transaction estops it from claiming the benefit of this exception to the tax-benefit rule, whether or not all the technical elements of estoppel are present. Petitioner's treatment of this item on its tax returns misled the revenue agents, and it does not matter whether this was done deliberately or unintentionally. Cf. *Ross* v. *Commissioner*, 169 F. 2d 483, 492, 496 (C.A. 1, 1948), reversing on another point a Memorandum Opinion of this Court. The entries of the deductions in the 1957–60 tax returns—"Refund as ordered by FPC" or "Refund as ordered by the FPC"—conveyed the impression that the refunds had already been paid,[4] rather than that the liability was being contested and that payment awaited resolution of that dispute. The entries made no reference to the pending litigation or to the suspension of the FPC order by the agreement that petitioner would be required to make the refunds only if the rate increase was not ultimately allowed. Indeed, at the time the 1960 return was filed, the rate dispute had already been settled, and petitioner knew that the refunds would never be made. In no circumstance was the item deductible for that year, cf. *Fawcus Machine Co.* v. *United States*, 282 U.S. 375 (1931); yet no clue of the rescission of the FPC order appears in the 1960 return. Not until its 1961 return was being prepared did petitioner, deliberately and in the face of conflicting counsel from its tax advisers, switch its legal theory to one designed to provide for the complete tax escape of these sums. Not until that return was filed did petitioner refer to this item as a "contingent liability."

Having thus dealt with the Government, petitioner cannot now be heard to say that its 1957–60 accruals were erroneous. To allow it to do so would permit it to "found * * * [its] claim upon * * * [its] own inequity or take advantage of * * * [its] own wrong" in claiming the

---

[4] The district chief of the field audit branch, Internal Revenue Service, called as a witness by petitioner, testified as follows with respect to this entry in the returns:

"Q. As an experienced auditor, simply looking at that entry on the return * * *, what would that mean to you?

"A. It would mean to me that the, that Mayfair Minerals made a refund in this amount as ordered by the FPC, Federal Power Commission."

erroneous deductions and using misleading labels to describe them. *Stearns Co.* v. *United States*, 291 U.S. 54, 62 (1934).

In a variety of factual settings, the courts have declared that a taxpayer has a duty of consistency in making its returns where the tax consequences of a transaction occurring in one year are projected into a subsequent one. A classic statement of this principle is found in *Orange Securities Corp.* v. *Commissioner*, 131 F. 2d 662 (C.A. 5, 1942), affirming 45 B.T.A. 24 (1941), where the issue was the basis of notes which had been treated as having no value when they were acquired. The court held that the taxpayer, after the statute of limitations had expired, could not show the notes had value, stating (131 F. 2d at 663) :

> While it is true that income taxes are intended to be settled and paid annually each year standing to itself, and that omissions, mistakes and frauds are generally to be rectified as of the year they occurred, this and other courts have recognized that a taxpayer may not, after taking a position in one year to his advantage and after correction for that year is barred, shift to a contrary position touching the same fact or transaction. When such a fact or transaction is projected in its tax consequences into another year there is a duty of consistency on both the taxpayer and the Commissioner with regard to it, whether or not there be present all the technical elements of an estoppel. * * *

See also *Continental Oil Co.* v. *Jones*, 177 F. 2d 508, 512 (C.A. 10, 1949), certiorari denied 339 U.S. 931 (1950) ; *Johnson* v. *Commissioner*, 162 F. 2d 844, 846 (C.A. 5, 1947), affirming in part 7 T.C. 465 (1946) ; *Wichita Coca Cola Bottling Co.* v. *United States, supra* at 8 ; *Commissioner* v. *Dallas Title & Guar. Co., supra* at 214; *Comar Oil Co.* v. *Helvering*, 107 F. 2d 709 (C.A. 8, 1939), affirming 37 B.T.A. 1334 (1938) ; *Alamo Nat. Bank* v. *Commissioner*, 95 F. 2d 622, 623 (C.A. 5, 1938), affirming 36 B.T.A. 402 (1937), certiorari denied 304 U.S. 577 (1938) ; *Irving Bartel*, 54 T.C. 25 (1970) ; *C. H. Wentworth*, 25 T.C. 1210, 1214 (1956), affd. 244 F. 2d 874 (C.A. 9, 1957) ; *Lloyd H. Faidley*, 8 T.C. 1170, 1173 (1947).

In situations where the duty of consistency or quasi-estoppel applies, a taxpayer is required to follow the tax-benefit rule even though the original deduction was erroneous. Thus, in *Askin & Marine Co.* v. *Commissioner*, 66 F. 2d 776 (C.A. 2, 1933), affirming 26 B.T.A. 409 (1932), the taxpayer took deductions for debts which, concededly, were not actually ascertained to be worthless. Rejecting the theory that, because the deductions were not allowable, no part of the collections of such debts in a later year may be included in income under the tax-benefit rule, the court said (at 778) :

> It is obvious that if this is so a taxpayer who gets an unlawful deduction in this way not only cuts down his taxable income in the year the deduction is taken, but gets immunity from income taxation on the account receivable which was deducted whenever it, or any part of it, is received. A result so unjust is not to be reached unless plainly required by law. Having represented that it had ascer-

tained these accounts charged off its active file to be worthless and having received the benefit of the deduction it claimed when the commissioner took its representation of the ascertainment of worthlessness at its face value, we think the petitioner is now clearly estopped from denying, to the prejudice of the government, the truth of the representations upon which it has succeeded in former years in obtaining deductions from its gross income. While the commissioner must investigate returns to satisfy himself of their correctness in fact and law, a taxpayer may not benefit at the expense of the government by misrepresenting facts under oath; by succeeding in having the commissioner accept its representations as the truth; and by claiming later that what it represented to be true might have been found false had the commissioner refused to have faith in the sworn return. * * *

In a similar factual situation in *Commissioner* v. *Liberty Bank & Trust Co.*, 59 F. 2d 320, 325 (C.A. 6, 1932), reversing *Liberty Insurance Bank*, 14 B.T.A. 1428 (1929), the court said:

we cannot assent to the view that a taxpayer which has been allowed a deduction for a debt, on its statement under oath that the debt has been ascertained to be worthless, is not estopped thereafter from denying the truth of the statement to the prejudice of the government. The Commissioner of necessity does and must rely largely upon the representations of the taxpayer, and, in order to estop the taxpayer from assuming a contrary position, he is not compelled to look with suspicion upon all such representations and himself examine, or cause to be examined, the financial condition of all the taxpayer's debtors. It is the duty of the taxpayer to deal fairly and truthfully with the government. * * * we think it is to be presumed from the fact that these deductions were allowed for the years in which they were claimed that the Commissioner relied upon the taxpayer's sworn statements that the debts were worthless.* * *

In *Lloyd H. Faidley, supra*, the taxpayer claimed and was allowed a loss on its 1930 return and then denied that he had income in 1941, when he received reimbursement for the loss under a guaranty agreement. The Court said (8 T.C. at 1173):

The petitioner took a deduction in his 1930 return which he now claims should not have been allowed. He stated in his return that his investment was "a complete loss, there being no salvage." The petitioner, who had knowledge of the true facts, never undertook to correct the return. The return was accepted and audited as being correct. The evidence does not justify any finding that the respondent had knowledge of any facts other than those stated in the return. In short, there was no mutual mistake. The year of deduction is now closed by the statute of limitations and is not before us. It can not be reopened by waiver in this proceeding. We hold that the petitioner is estopped to contend that the recovery in 1941 does not constitute taxable income because of the fact that the deduction may have been erroneously claimed and allowed in 1930.* * *

There is nothing in *Streckfus Steamers, Inc., supra*, to the contrary; in that case the Court observed (19 T.C. at 9) that "no estoppel has been pleaded, nor was any evidence presented showing any basis for an estoppel." And there is no indication in *Adolph B. Canelo III, supra*, that either quasi-estoppel or the duty of consistency was pleaded or

otherwise relied upon by the Commissioner. On this issue, those cases stand only for the proposition that the tax-benefit rule does not warrant disregard of the statute of limitations; in other words, where the Commissioner is timely apprised, or should know, that a deduction is erroneous, he must disallow it for the year it is claimed rather than await a subsequent year and attempt to recoup the item by employing the tax-benefit rule. Those cases are clearly inapposite where the taxpayer, either deliberately or unintentionally, misleads the Commissioner through erroneous representations of fact in his returns, and the Commissioner, consequently, allows the statute of limitations to run on adjustments of taxable income on the misleading returns.

Petitioner next seeks a partial escape from the tax-benefit rule by stating that it filed its 1961 return prior to the expiration of the statute of limitations for 1958 through 1960,[5] and arguing that the Commissioner was, therefore, informed of the true facts in time to disallow the deductions for those years. When considered in the light of the evidence, we think this argument borders on the facetious. The record shows that petitioner knew full well how, in 1961, it could have called its erroneous accruals for each of the prior years to the attention of the Commissioner—by filing amended returns for each of the years. It decided not to do this even though its president was expressly advised of section 1.461-1(a)(3), Income Tax Regs., which provides that "if a taxpayer ascertains that a deduction was improperly claimed in a prior taxable year, he should, if within the period of limitation, file an amended return and pay an additional tax due." Instead of complying with the directions in this regulation or the advice of two senior partners in its accounting firm to report the previously deducted amounts as 1961 taxable income, petitioner chose to make a "disclosure" in Schedule M of its 1961 return. Even in doing this, it did not follow the advice of its private attorney merely to report "the restoration to surplus of all accrued accounts payable based on the original FPC order * * * with the explanation in substance that the amounts were restored to surplus because of the recision of the original order of the FPC." Instead, petitioner, through an unusual and confusing notation on Schedule M, camouflaged the restoration to surplus by showing offsetting entries to other liability accounts—i.e., entries increasing its reserve for intangible development costs [6] and creating a reserve for taxes—which precisely equaled the amount of the restored rate refunds.

---

[5] The statute of limitations had already run on 1957 when the 1961 return was filed.
[6] According to petitioner's accountants, this adjustment did not conform with generally accepted accounting principles.

· While the entry in Schedule M of the 1961 return may have provided a technical shield from a charge of "fraud," [7] we do not think it constituted the kind of disclosure needed to fulfill petitioner's "duty of handling * * * [its] accounting so it will fairly subject * * * [its] income [for 1957 through 1960] to taxation." *Wichita Coca Cola Bottling Co.* v. *United States, supra* at 8. The law contemplates that "Each year's return should be complete in itself." Sec. 1.461–1(a)(3), Income Tax Regs. The purpose of tax returns "is not alone to get tax information in some form but also to get it with such uniformity, completeness, and arrangement that the physical task of handling and verifying returns may be readily accomplished." *Commissioner* v. *Lane-Wells Co.*, 321 U.S. 219, 223 (1944). This is also, quite obviously, the underlying reason for the provision in section 1.461–1(a)(3) of the regulations, referred to above, on the filing of amended returns to correct errors in claiming deductions. The "disclosure" on the 1961 return did not provide in a uniform, complete, and orderly fashion the information necessary to verify that petitioner's income for 1957 through 1960 was being fairly subjected to taxation.

A fair review of the evidence on how petitioner handled this matter after the FPC order was rescinded shows that petitioner was not even attempting to discharge its duty to fairly subject its income to taxation. In the "discussions" which followed the rescission of the FPC order, petitioner's representatives were apparently seeking a formula which would reveal only enough information to avoid a charge of fraud while concealing enough to allow this income to escape tax. The course of action finally adopted was obviously an attempt by petitioner to take advantage of its own wrong. *Stearns Co.* v. *United States, supra.* Petitioner's "disclosure," obscured in its return for 1961, clearly was designed to delay any definitive action with respect to the returns of those years until after the statute of limitations had run.

The testimony describing the examinations of the 1957–60 returns leading to their being marked "Closed on Survey" indicates that each return was examined separately and at different times. We are not advised when the 1961 return was first examined by the revenue agents, but the notice of deficiency was not mailed until October 30, 1968, more than 4 years after the 3-year statute of limitations for the 1960 return expired. We do not think respondent may be charged with

---

[7] Petitioner's basic policy with respect to this item was stated in a letter to its president, dated Dec. 6, 1961, in part as follows: "Mayfair's management will not countenance any proposed course of action where there is even a remote possibility that IRS would allege fraud or conspiracy. Absent any such possibility, management plans to take all available steps to insure that Mayfair does not ultimately pay more taxes than are believed to be justly owed."

knowledge of the facts regarding this transaction in time to disallow the erroneous deductions for any of the prior years.[8]

Petitioner next contends that the parties made a mutual mistake of law and, therefore, the duty-of-consistency rule does not apply. Petitioner asserts that its representatives were not aware that a disputed liability is not subject to accrual until the Supreme Court handed down its decision in *United States* v. *Consolidated Edison Co.*, 366 U.S. 380, on May 22, 1961, after the 1960 and prior returns had been filed. Respondent's representatives who examined petitioner's returns were likewise unaware that a disputed liability is not accruable,[9] so goes the argument, and both groups made a mistake of law.

We reject this argument. The Supreme Court decision in *Consolidated Edison* did not deal with unpaid, disputed liabilities. It dealt with the effect of payment on the deductibility of a disputed item; indeed, both parties in that case started with the assumption that an unpaid contingent liability, being disputed in the courts, is not accruable. While the record here includes certain self-serving documents suggesting that petitioner's representatives were not aware that the contingent refund liability was not accruable, no one so testified. Nor did anyone explain the misleading notations, "Refund as ordered by FPC" or "Refund as ordered by the FPC," used in the 1957–60 returns to describe the item. And there is not a syllable of evidence to show that any of the revenue agents became aware of the true facts until the 1961 return was examined. A mutual mistake of law can occur only where the crucial facts are known to both parties, and there is no showing that respondent knew such facts when the 1957–60 returns were surveyed and accepted without change.

---

[8] There is testimony to the effect that respondent's agents attempted to review the returns of all taxpayers with assets in excess of $1 million, such as petitioner, within 20 months after they were filed. Had respondent's agents reviewed the 1961 return within that period, about 4 months would have remained before the statute of limitations expired on 1960. However, this was only a preliminary review to determine whether the return should be audited. The information relating to this item was so skillfully obscured in the 1961 return that the true facts as they related to the 1957–60 returns probably could not have been learned without an examination of petitioner's books and records.

[9] No testimony was sought or elicited from respondent's representatives to establish the factual premise that they thought a disputed, contingent liability was deductible at the time they reviewed the returns for the years 1957 through 1960. To support its assertion of mutual mistake, petitioner relies upon a remark by respondent's counsel in his opening statement explaining one of his contentions, which we find it unnecessary to consider, i.e., that petitioner's failure to report the 1961 cancellation of the account payable for the rate refunds was a change of accounting method which required the Commissioner's approval. However, we understand this opening statement to mean that, for purposes of that argument, we could assume that the original reporting was correct. Respondent's other position—supported by a determination in the notice of deficiency and pleaded in the answer—is based on estoppel or the duty of consistency. In explaining this position in his opening statement, respondent's counsel stated that "something in the nature of deceit was worked upon the government" and "the entries as they were shown to the government on * * * [petitioner's 1957–60] return[s] were misleading."

Finally, petitioner argues that the doctrine of estoppel, quasi-estoppel, and duty of consistency have been supplanted in the income tax law by sections 1311–1315, originally enacted as part of the Revenue Act of 1938, and those sections do not apply to the present facts. In adopting that legislation, however, Congress disavowed any intention to purge the tax laws of these doctrines (S. Rept. No. 1567, 75th Cong., 3d Sess. (1938), 1939–1 C.B. (Part 2) 815) :

In each case, under existing law, an unfair benefit would have been obtained by assuming an inconsistent position and then taking shelter behind the protective barrier of the statute of limitations. Such resort to the statute of limitations is a plain misuse of its fundamental purpose. The purpose of the statute of limitations to prevent the litigation of stale claims is fully recognized and approved. But it was never intended to sanction active exploitation, by the beneficiary of the statutory bar, of opportunities only open to him if he assumes a position diametrically opposed to that taken prior to the running of the statute. The Federal courts in many somewhat similar tax cases have sought to prevent inequitable results by applying principles variously designated as estoppel, quasi-estoppel, recoupment and set-off. For various reasons, mostly technical, these judicial efforts cannot extend to all problems of this type. Nor can they provide a uniform, systematic solution of these problems. Legislation has long been needed to supplement the equitable principles applied by the courts and to check the growing volume of litigation by taking the profit out of inconsistency, whether exhibited by taxpayers or revenue officials and whether fortuitous or the result of design.

Thus, not only did Congress express an intention merely "to supplement the equitable principles applied by the courts," but also condemned the "assuming [of] an inconsistent position and then taking shelter behind the protective barrier of the statute of limitations"—this is precisely what petitioner is attempting to do—and declared that "Such resort to the statute of limitations is a plain misuse of its fundamental purpose."[10]

We hold that petitioner, having received tax benefits during 1957 through 1960 from the deduction of accruals of rate refunds, realized taxable income in 1961 when its liability to make the refunds terminated.

*Decision will be entered under Rule 50.*

---

[10] Many of the cases cited above applying quasi-estoppel or the duty of consistency were decided after the effective date of secs. 1311–1315 or their predecessors. See, e.g., *Continental Oil Co.* v. *Jones,* 177 F. 2d 508 (C.A. 10, 1949), certiorari denied 339 U.S. 931 (1950) ; *Johnson* v. *Commissioner,* 162 F. 2d 844 (C.A. 5, 1947), affirming in part 7 T.C. 465 (1946) ; *Wichita Coca Cola Bottling Co.* v. *United States,* 152 F. 2d 6 (C.A. 5, 1945) ; *Commissioner* v. *Dallas Title & Guar. Co.,* 119 F. 2d 211 (C.A. 5, 1941), modifying 40 B.T.A. 1022 (1939) ; *Irving Bartel,* 54 T.C. 25 (1970) ; *C. H. Wentworth,* 25 T.C. 1210 (1956), affd. 244 F. 2d 874 (C.A. 9, 1957) ; *Lloyd H. Faidley,* 8 T.C. 1170 (1947).