RAYMOND GARNER and BETTY GARNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Garner v. Comm'r
Docket No. 8458-79.
United States Tax Court
T.C. Memo 1981-542; 1981 Tax Ct. Memo LEXIS 203; 42 T.C.M. (CCH) 1181; T.C.M. (RIA) 81542; September 24, 1981. Raymond Garner, pro se. Reid M. Huey, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency of $ 12,702.27 in petitioners' Federal income tax for the year 1975. After concessions, the only issues for decision are: 1. Whether petitioners are entitled to a transportation expense deduction of $ 10,750 computed under the simplified standard mileage rate of Rev. Proc. 74-23, 1974-2 C.B. 476 and, if not, whether petitioners are entitled to a transportation expense deduction *206 in any amount based upon their actual expenses; and 2. Whether petitioners are entitled to a net operating loss carryover deduction of $ 12,474.89 or any other amount under section 172. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Raymond Garner and Betty Garner resided in Florissant, Missouri, at the time they filed their petition in this case. They timely filed joint Federal income tax returns for the taxable years ended December 31, 1973, December 31, 1974, and December 31, 1975. Petitioner Betty Garner is a party to this proceeding solely because she filed a joint return with her husband, and the term petitioner will hereinafter refer to Raymond Garner. During 1975, petitioner operated a sole proprietorship called "Law Enforcement Canine" that was engaged in the business of training and handling guard dogs for use in law enforcement activities. Petitioner *207 trained dogs for particular tasks such as tracking, bomb detection, narcotics work, riot control, and other police or emergency services. When such an event occurred, petitioner received a call requesting that he transport a particular type of dog or dogs to the scene of the event. Petitioner received an average of 15 to 20 such calls each month from customers that included police departments, the customs service, and various other Government agencies. A substantial portion of petitioner's business activities thus consisted of transporting dogs to different areas where their services were needed. During 1975, petitioner owned and maintained six vehicles, including three 1973 Plymouth automobiles, one 1974 Chrysler automobile, one 1973 Chevrolet van, and one Winnebago motor home, solely for use in his canine business. Some vehicles were equipped to transport only one dog and others were equipped to transport two or more. The bomb-detection dogs could be transported only in a special carrier. Petitioner had such air formula vehicle or carrier with a sealed, recirculating air system to transport dogs trained in the detection of explosives. [2] In addition, petitioner outfitted *208 a "command post vehicle" with a telephone for use in the field with his customers. Petitioner used all six vehicles to transport his dogs to different work areas and employed contract laborers who helped him with that driving. Petitioner's wife occasionally used one of the six vehicles during 1975 to pick up petitioner at the airport, but she used her own car for all other purposes. Petitioner conducted almost all of his canine business from his home, where he maintained his office. However, he maintained three other business locations where he stored the cars and maintained the kennels. The cars, other than the one he happened to be using at the moment, were normally stored at St. Charles, Missouri, about eight miles from his home in Florissant. Petitioner usually used his vehicles to transport dogs from his home or from the kennels to different work areas. The contract drivers would pick up a car and/or the dogs from whatever location the particular car or *209 particular animal happened to be. The other two locations for petitioner's dog business were Jefferson City, Missouri, and O'Fallon, Missouri, about 122 miles and 17 miles, respectively, from petitioner's home. Petitioner generally used one of the Plymouth automobiles or the Chrysler to drive between his home office and these other business locations. Petitioner normally had to drive from his home to the St. Charles storage area about twice a week. Petitioner and his drivers were regularly switching vehicles or dogs at the various locations depending upon the calls for the canine services. For example, on occasions when petitioner received a bomb call and also needed to use his field telephone, he drove to St. Charles in his "command post vehicle" to pick up the air formula vehicle. He then towed the air formula vehicle and plugged its air system into his command post vehicle. Aside from transporting the dogs to work areas and driving from his home to his other business locations, petitioner did not use his six vehicles for any other purposes during 1975. On the joint income tax return that he filed with his wife for 1975, petitioner deducted $ 10,750 for transportation expenses *210 using the optional or simplified standard mileage rate. Petitioner reached this amount by claiming 100,000 business miles and by computing the first 15,000 miles at $ .15 per mile and the remaining 85,000 miles at $ .10 per mile. Petitioner substantiated the actual operating costs for the six vehicles in the following amounts: Item
Amount
Gas
$ 4,184.31
Maintenance
4,369.10
License
201.62
Insurance
1,003.38
Total: $ 9,758.41
Petitioner's dispatcher maintained mileage records for each of petitioner's six vehicles separately. However, gasoline expenses were not separately apportioned and were recorded as a single expense. Moreover, insurance expenses for the six vehicles were combined in the nature of fleet insurance coverage. Respondent determined that petitioner was not entitled to use the standard mileage rate but was required to use actual operating costs in computing deductible transportation expenses. Respondent further determined that none of petitioner's substantiated vehicle expenses were allowable since he failed to show what portion of those expenses was incurred for business purposes. On the 1975 joint income tax return that he filed *211 with his wife, petitioner also claimed as a deduction a net operating loss carryover of $ 12,474.89 from a flood loss that occurred during March of 1973. After a flood that destroyed petitioner's household belongings and some of his business property, one of respondent's agents gave petitioner the option of amending his 1972 return and claiming an immediate disaster loss under section 165(h) or deducting the loss on his 1973 return. Petitioner claimed the casualty loss deduction on his joint return for 1973 in the amount of $ 28,100. Petitioner's loss for 1973 offset his adjusted gross income of $ 8,066.89 for that year. When petitioner initially filed his joint income tax return for 1974, he did not claim a net operating loss carryover deduction from the 1973 flood loss. On his joint income tax return for 1975, however, petitioner claimed a net operating loss carryover deduction of $ 12,474.89 and made the following computation on the basis that the 1973 flood loss had been partly absorbed in 1974 but had not been absorbed at all during 1973: Flood Loss in 1973 Net Operating Loss
$ 28,100.00 Less 1974 Adjusted Gross Income
(5,939.81)
$ 22,160.19 1975 Adjusted Gross Income
Before
Net Operating Loss
* (12,474.89)
Carry forward to 1976
$ 9,685.30 *212 Respondent previously examined petitioners' 1974 joint income tax return. As a result of that examination, respondent issued a statutory notice of deficiency to petitioners on January 31, 1978. On March 30, 1978, petitioners filed a petition in this Court to contest the deficiency as determined for 1974 (Docket No. 3448-78S). Throughout the ensuing negotiations regarding petitioners' 1974 income tax liability, petitioners were represented by Chester B. Hein. Petitioners had given Hein a power of attorney to represent them before the Internal Revenue Service for their taxable years 1973 through 1976. An issue for determination regarding the 1974 adjustments was whether any portion of the 1973 flood loss was allowable as a carryover deduction for 1974. After examining petitioners' loan requests to the Small Business Administration (SBA) showing their basis in personal and business property, and after making an adjustment for a $ 5,000 forgiveness of part of the SBA loan, respondent computed the deductible amount of the 1973 casualty loss to be $ 13,370.36. [3]
*213 Respondent computed petitioners' net operating loss by allowing part of the $ 13,370.36 casualty loss as a deduction from petitioners' 1973 adjusted gross income of $ 8,066.89, leaving $ 5,303.07 available for absorption as net operating loss carryback and carryover deductions. Respondent then determined petitioners' allowable net operating loss carryback and carryover deductions under section 172 as follows: Carryback from 1973
($ 5,303.07)
1971 Taxable Income Per Return [4]
($ 240.26)
Section 172 Modification
2,700.00 Modified Taxable Income
2,459.74 Unused 1973 Loss to Carry
Forward to 1972
($ 2,843.33)
1972 Adjusted Gross Per Return
$ 3,834.22 Less Low Income Allowance
(Std. Ded.)
1,300.00 $ 2,534.22 Less Personal Exemptions
3,000.00 Taxable Income as Computed
(465.78)
Section 172 Modification
3,000.00 Modified Taxable Income
2,534.22 Unused 1973 Loss to Carry
Forward to 1974
($ 309.01)
Used in Appeals Settlement of
1974 Case
309.01 Unused Balance
*214 On August 17, 1978, there was a settlement conference held between petitioners' representative Chester Hein and one of respondent's appeals officers regarding petitioners' 1974 tax liability. During that conference, Hein tentatively agreed with and reached a proposed settlement based on respondent's determination of petitioners' 1973 casualty loss and of the net operating loss carryback and carryover deductions during 1971, 1972, and 1974 resulting from that loss. On November 8, 1978, respondent sent petitioners a letter containing (1) a stipulation-decision document based on the settlement proposed at the August 17 conference, (2) the audit statement for 1974, (3) the statement of account for 1974, and (4) the statement of income tax changes for 1974 showing allowance of a flood loss in the amount of $ 309.11. In that letter, respondent asked petitioners to execute the stipulation-decision which stated that there was no deficiency in petitioners' 1974 income taxes. Petitioners signed the stipulation-decision document on January 12, 1979; and respondent signed the stipulation-decision document on January 19, 1979. On January 26, 1979, this Court entered a decision in the case *215 of Raymond Garner and Betty Garner v. Commissioner, Docket No. 3448-78S, based upon the parties' stipulation-decision document. In the present case involving taxable year 1975, petitioner again raises the issue of the deductible amount of the 1973 flood loss and the net operating loss carryback and carryover deductions resulting from that loss. In so doing, petitioner contends that the loss was not fully absorbed in computing the income tax liabilities for earlier years and is allowable in part in determining the income tax liability for 1975. Respondent disallowed petitioner's net operating loss deduction of $ 12,474.89 claimed in 1975 on the ground that the 1973 flood loss was completely absorbed through carryback and carryover adjustments to 1971, 1972, and 1974, leaving no amounts deductible in 1975. OPINION The first issue for decision is whether petitioner is entitled to a transportation expense deduction of $ 10,750 computed under the simplified standard mileage rate of Rev. Proc. 74-23, 1974-2 C.B. 476. Respondent argues that petitioner is not entitled to use the standard mileage rate because he used two or more automobiles simultaneously in his *216 business. Respondent further determined that none of petitioner's substantiated vehicle expenses were allowable since petitioner failed to show what portion of those expenses were incurred for business purposes. However, respondent now agrees that petitioner is entitled to a deduction in some amount.
Section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Under that provision, a self-employed person like petitioner may deduct the cost of operating an automobile to the extent that it is used in his trade or business. Deductions for automobile expenses may be computed in one of two ways: under the regular method involving actual expenses or under the optional or simplified method involving a standard mileage rate. The optional or simplified method has been permitted under numerous revenue procedures in effect since 1964. [5] The primary change made in each revenue procedure has been the amount of the standard rate. However, the limitations regulating use of the optional method have stayed substantially *217 the same. As in effect during 1975, Rev. Proc. 74-23, 1974-2 C.B. 476, allowed 15 cents per mile for the first 15,000 miles of business use each year and 10 cents per mile for business mileage in excess of 15,000 per year subject to the following limitations: .02 The use of the simplified method is limited to a self-employed individual or an employee who operates only one automobile at a time for business purposes. Where a person alternates in using different automobiles on different occasions for business purposes, the standard mileage rate applies to the total business mileage of such automobiles, as if they were *218 one, to arrive at a deduction. Similarly, if an individual replaces his automobile during the year, the total business mileage for the year of both automobiles must be used, as if they were one, in applying the standard mileage rate. .03 This method is not acceptable for computing the deductible costs of (A) vehicles used for hire, such as taxicabs, or (B) two or more automobiles used simultaneously, such as in fleet operations. (Emphasis supplied.) This Court has upheld the limitation in the revenue procedures that prohibits a taxpayer from using the standard mileage rate where he uses two or more automobiles simultaneously in his business. West v. Commissioner, 63 T.C. 252 (1974). [6]
In West, a taxpayer who operated two vehicles on separate newspaper delivery routes under two separate contracts with a newspaper company argued that he was entitled to use the standard mileage rate in computing his deductible automobile expenses. In that case, we stated: Rev. Proc. 70-25 [the revenue procedure *219 in effect during that year] in itself creates no deduction, but was intended to provide some relief from the substantiation requirements of section 162 and 274… for self-employed individuals and employees using their own vehicles on business. J. Bryant Kasey, 54 T.C. 1642 (1970), affirmed per curiam 457 F. 2d 369 (C.A. 9, 1972). Substantiation is difficult for such persons both because of the need for detailed recordkeeping and the problem of allocating such expenditures as maintenance and gasoline between business and personal uses. The respondent is clearly entitled to place restrictions on the size and type of businesses qualifying for this special treatment. * * * 63 T.C. at 254. We held that the taxpayer in West was not entitled to use the standard mileage rate because his use of the two vehicles "was sufficiently integrated to constitute a single operation" so as to come within the specific exclusion in the revenue procedure of "two or more automobiles used simultaneously, such as is fleet operations." Our decision in West is dispositive of the issue herein. The record in the present case shows that petitioner and *220 his contract laborers used the six vehicles herein simultaneously in petitioner's canine business during 1975. Moreover, petitioner recorded gasoline expenses for all six vehicles as a single expense and maintained fleet insurance coverage for all six vehicles. We conclude that the use of petitioner's six vehicles in his canine business by himself and his contract laborers was "simultaneous" and, under the language in West, was "sufficiently integrated to constitute a single operation." [7] 63 T.C. at 225. Petitioner is thus subject to the usual substantiation requirements applicable to businesses generally under section 162. Petitioner has established the actual expenses for operating the six vehicles used in his business. Respondent agrees that the amount has been substantiated, but does not agree that all of the expenses were incurred for business purposes. Respondent says that petitioner has failed to sustain his burden of proof as to the allocation or proportion of *221 business and personal use of the vehicles, and for that reason respondent did not allow any deduction at all for transportation expense. Respondent now agrees that petitioner is entitled to a deduction in some amount. Apparently respondent is arguing for a rather small deduction because of the supposed failure of proof as to the business usage and because respondent says some of the travel was nondeductible commuting or other personal use. Commissioner v. Flowers, 326 U.S. 465, 473 (1946), rehearing denied 326 U.S. 812 (1946). We disagree. On this record we are satisfied that most, if not all, of the use of the vehicles was for business purposes. Petitioner's business was the training and handling of specially-trained dogs for law enforcement activities such as tracking, bomb detection, narcotics work, riot control, and other emergency services. Petitioner had his business office in his home. He also had three other business locations that were not offices as such but were used for storage of the vehicles and for the kennels. A substantial portion of petitioner's business activities consisted of transporting a particular dog or dogs to different *222 areas where their services were needed by law enforcement officials. The travel for any particular job depended upon where the particular dog or dogs, and where the particular vehicle equipped to transport the dog or dogs, happened to be located when a call for the canine services was received. Petitioner and his contract drivers used the vehicles extensively to transport the dogs. We accept petitioner's testimony that the vehicles were not used for personal purposes and were used exclusively in the canine business. We are also satisfied that there was no commuting in the sense of driving from petitioner's home to his place of business. Petitioner had his office in his home, and his travel was either between his various business locations or from his home office to the area where the canine services were needed. Curphey v. Commissioner, 73 T.C. 766, 777-778 (1980); Heuer v. Commissioner, 32 T.C. 947 (1959); affd. 283 F. 2d 865 (5th Cir. 1960). The only possible personal use of the vehicles appears to have been the few occasions during 1975 when petitioner's wife used one of the cars to pick petitioner up at the airport. It *223 is quite likely that some of that travel was also related to petitioner's business, because during 1975 he was spending virtually all of his time working and trying to make a success of his failing business. In any event, any such personal use was strictly deminimis, and we will not make any adjustment reducing the amount substantiated and will allow a deduction for the full $ 9,758.41. [8]
The second issue for decision is whether petitioner is entitled to a net operating loss (NOL) deduction under section 172. Petitioner claimed a flood loss deduction in the amount of $ 28,100 on his 1973 tax return. He argues that he was entitled to carry forward and deduct as NOL carryovers all of the loss not absorbed in 1973. Petitioner has treated the loss inconsistently on his various tax returns: (1) he used some of that claimed loss as a deduction on his 1973 return; (2) he claimed no carryover deduction from that loss on his 1974 return; and (3) he claimed a NOL carryover deduction of $ 12,474.89 on *224 his 1975 return. Petitioner attached a statement to the 1975 return purporting to explain the claimed loss deduction. That statement indicated that none of the flood loss was used during 1973 but that $ 5,939.81 of that loss was used during 1974. Respondent argues that the 1973 flood loss was completely absorbed through carryback and carryover adjustments to petitioner's income in 1971, 1972, and 1974, and that none of the loss remained for deduction in 1975. Respondent bases his argument on his determination that petitioner's deductible casualty loss in 1973 was an amount of $ 13,370.36 rather than the $ 28,100 originally claimed by petitioner, that $ 8,067.29 of that loss was absorbed in 1973, and that the remaining $ 5,303.07 was absorbed as carryback and carryover deductions in 1971, 1972, and 1974. Respondent further argues that in view of a decision entered by this Court based on the parties' settlement for the year 1974, which incorporated respondent's computation of the 1973 flood loss and its carryback and carryover effect, petitioner has a "duty of consistency" (also termed "quasi-estoppel") that bars him from asserting a contrary position in regard to the flood loss *225 for the year 1975. The courts have held that taxpayers have a duty of consistency in making their returns where the tax consequences of transactions occurring in one year are projected into later years. Orange Securities Corp. v. Commissioner, 131 F. 2d 662, 663 (5th Cir. 1942); Comar Oil Co. v. Helvering, 107 F. 2d 709, 712 (8th Cir. 1939). Taxpayers are under a duty of consistency where the following conditions exist: (1) the taxpayer has made a representation or reported an item for tax purposes in one year; (2) respondent has acquiesced in or relied on that fact for that year; and (3) the taxpayer wants to change the prior representation in a later year after the statute of limitations bars adjustments for the initial tax year. The rationale for the rule is that taxpayers should not be allowed to take an advantageous position in a tax matter is one year and then, after correction of that year is barred, shift to a contrary position touching on the same matter that is beneficial to him in a later year. This Court has accepted the rule of a duty *226 of consistency or quasi-estoppel. Unvert v. Commissioner, 72 T.C. 807 (1979), on appeal (9th Cir., November 5, 1979); Mayfair Minerals, Inc. v. Commissioner, 56 T.C. 82 (1971), affd. per curiam 456 F. 2d 622 (5th Cir. 1972); Bartel v. Commissioner, 54 T.C. 25 (1970). The present case may not be a proper one for the application of quasi-estoppel or the duty of consistency. It could be argued that it was respondent and not petitioner who made the NOL computation on which the 1974 settlement was based, and that petitioner is not trying to change his own representation concerning the 1974 loss deduction, but has been consistent in attempting to carry the 1973 loss forward on his tax returns, albeit in a somewhat confusing manner. However, we need not decide whether or not petitioner is bound by the application of quasi-estoppel or the duty of consistency. We sustain respondent for two more basic reasons. In the first place, petitioner is wrong on the law when he argues that he is entitled to NOL carryovers without having to first carry the loss back to the earlier years. [9] Secondly, respondent has determined that *227 the amount of the loss was only $ 13,370.36 and petitioner, who has the burden of proof, has not established otherwise. Therefore applying the proper computations under section 172, it is clear, as respondent says, that the loss had been absorbed before the year 1975 and that there was no remaining loss to be carried over and deducted in 1975. This will be explained in detail below. The problem in this case results from petitioner's misunderstanding of the interplay of the disaster loss election under section 165(h) and the NOL rules of section 172. After petitioner's home was declared to be part of a disaster area, one of respondent's agents told petitioner that he had a choice of amending his 1972 tax return and claiming an immediate loss or reporting the loss on his 1973 return. It appears that petitioner misunderstood the nature of that election and thereby believed that he could carry *228 forward all of his unused 1973 loss as section 172 deductions in future years, without having to first carry it back to the earlier years.
Section 165(a) allows a deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise. Section 165(c)(3) allows a deduction for losses of property not connected with a trade or business if such losses arise from a "fire, storm, shipwreck, or other casualty." Section 165(h) provides that notwithstanding section 165(a), a taxpayer may elect to deduct any loss attributable to a disaster on his return for the taxable year immediately preceding the taxable year in which the disaster actually occurred. Section 165(h) further provides that in the event a taxpayer makes the election therein, the casualty resulting in the loss will be deemed to have occurred in the preceding taxable year. Section 172(a) allows as a deduction for a taxable year the aggregate of NOL carryovers to that year and NOL carrybacks to that year. *229 Section 172(c) defines NOL as the excess of deductions allowed by Chapter 1 of the Code over the gross income for a taxable year with certain modifications under section 172(d). One such modification provides that a noncorporate taxpayer's nonbusiness deductions are allowed in computing the NOL for a year only up to the amount of the taxpayer's nonbusiness gross income for that year. [10]Section 172(d)(4). However, section 172(d)(4)(C) and section 1.172-3(a)(3)(iii), Income Tax Regs., provide that any deduction allowable under section 165(c)(3) for losses of property not connected with a business shall not be considered a nonbusiness deduction but shall be treated as a deduction attributable to the taxpayer's business for purposes of section 172(d)(4). Section 172(b)(1)(A)(i) and (B) allow the NOL *230 for a taxable year to be carried back to each of the three taxable years preceding and carried forward to each of the five taxable years following the taxable year of such loss. Section 172(b)(2), however, requires that the entire amount of the NOL for any taxable year shall be carried to the earliest of the taxable years to which such loss may be carried under section 172(b)(1), and that the portion of the loss which shall be carried to each of the other taxable years shall be the excess of the amount of that loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried. See sections 1.172-4(a)(1)(ii) and 1.172-4(b)(1)(i)-(ii), Income Tax Regs. Petitioner cannot avoid the requirement of the law in effect for the year 1975 that the loss must first be carried back before it is carried forward. In summary, the fact that petitioner deducted his flood loss in 1973, rather than electing under section 165(h) to take the loss in 1972, has no effect on whether petitioner may carry forward a NOL under section 172. Section 165(h) provides only that *231 disaster victims may elect to deduct a casualty loss on their return for the immediately preceding taxable year. Where such an election is made, the loss is deemed to have occurred during such preceding year. Once the year of the loss is established under either sections 165(a) or 165(h), however, section 172(b) determines the NOL carrybacks and carryovers resulting from that loss. The only questions remaining are the amount of petitioner's loss and whether or not the proper computations have been made under section 172.
Deductions are a matter of legislative grace and petitioner has the burden of proving his entitlement to the claimed 1975 NOL carryover deduction herein. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Welch v. Helvering, 290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Respondent determined that petitioner's casualty loss deduction for 1973 was $ 13,370.06 rather than the $ 28,100 claimed. The $ 13,370.06 represented petitioner's adjusted basis in business and personal property at the *232 time of the loss, less a $ 5,000 forgiveness of an SBA loan. Petitioner has not shown that he is entitled to a casualty loss deduction in excess of the amount allowed by respondent. Respondent also properly computed the NOL carrybacks and carryover resulting from the 1973 loss under the provisions of section 172, allowing carryback deductions for the two years prior to the year of the loss [11] and a carryover deduction absorbing the balance of the loss in the first year after the loss. Petitioner has failed to show that respondent's NOL computations are erroneous. Moreover, petitioner also accepted those adjustments in the settlement of his 1974 case when it served to wipe out his tax liability for that year. Accordingly, petitioner has not established that he is entitled to any further NOL deduction in 1975. To reflect the concessions and holdings herein, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year here involved, unless otherwise indicated.↩
2. The record is not entirely clear as to whether or not this carrier or vehicle was self-propelled or a trailer of some type. It was referred to by petitioner as "the bubble" and also as "the air formula car."↩
*. Petitioner deducted this amount on line 37 of the 1975 return as the net operating loss for that year.↩
3. Respondent disallowed the portion of the claimed casualty loss deduction that represented "economic loss" to cover any increased future operating expenses (replacement costs) caused by the flood. Respondent limited the casualty loss to petitioners' adjusted basis in the property at the time of the loss.↩
4. Respondent did not carry back petitioners' 1973 loss to 1970 (the third year before that loss) as prescribed by section 172(b)↩ because there was no record that petitioners had filed a joint income tax return for that year.
5. Rev. Proc. 64-10, 1964-1 C.B. (Part 1) 667 [for periods after December 31, 1962]; Rev. Proc. 66-10, 1966-1 C.B. 622 [for taxable years beginning after December 31, 1964]; Rev. Proc. 70-25, 1970-2 C.B. 506 [for periods after December 31, 1969]; Rev. Proc. 74-23, 1974-2 C.B. 476 [for periods after December 31, 1973] Rev. Proc. 77-40, 1977-2 C.B. 574 [for periods after December 31, 1976]; Rev. Proc. 80-7, 1980-1 C.B. 590↩ [for periods after December 31, 1978].
6. See also Carr v. Commissioner, T.C. Memo. 1979-400; Pate v. Commissioner, T.C. Memo. 1976-309↩.
7. Unlike the taxpayer in West↩, petitioner herein does not try to avoid the exclusion in the revenue procedure by arguing that he used his vehicles in separate trades or businesses.
8. We note that petitioner has not claimed any depreciation on any of the vehicles, and it would appear that some amount might well be allowable if properly substantiated.↩
9. Section 172(b)(3)(C)↩, which permits a taxpayer an election to relinquish the entitled carryback period, applies only to a net operating loss for taxable years ending after December 31, 1975.
10. The rationale for this limitation on nonbusiness deductions is to restrict the benefits of the NOL deduction under section 172(a) to losses attributable to a taxpayer's trade or business. See Todd v. Commissioner↩, 77 T.C.     (August 10, 1981).
11. See note 4, supra↩.