## COMMISSIONER OF INTERNAL REVE-NUE v. BROOKLYN UNION GAS CO.

### No. 25.

Circuit Court of Appeals, Second Circuit.
Jan. 9, 1933.

G. A. Youngquist, Asst. Atty. Gen. (Sewall Key and Norman D. Keller, Sp. Assts. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., Percy S. Crewe, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C., of counsel), for petitioner.

Cullen & Dykman, of Brooklyn, N. Y. (Arthur E. Goddard, of Brooklyn, N. Y., of counsel), for respondent.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge.

The income tax in dispute is that of the Brooklyn Union Gas Company and its five subsidiary corporations for the taxable year 1922. The respondent and its subsidiaries were engaged in the manufacture, distribution, and sale of illuminating gas in Brooklyn and its environs. Beginning with the year 1916, some or all of these companies were continuously involved in rate litigation until the controversies were settled in their favor in 1922. Out of this litigation has arisen a dispute as to the amount of their taxable income for that year. Voluminous findings of fact are set out in the opinion of the Board in 22 B. T. A. 507, and we shall restate them only to the extent deemed necessary for an understanding of the issues here presented.

In the so-called Rate Cases No. 1 the New York Public Service Commission issued orders in May, 1916, directing four of the subsidiary companies to reduce their rates. Proceedings were immediately instituted in the state court attacking the reduced rates as confiscatory, and an interlocutory order was made staying execution of the commission's reduced rates and directing that moneys collected in excess thereof be impounded in a bank subject to further order of the court. In July, 1919, the excess moneys so impounded were withdrawn by the companies, pursuant to court order, upon the giving of a bond for repayment in the event that the reduced rates should finally be sustained. In August, 1922, the commission abrogated, as of their original date, its orders reducing the rates. The Commissioner of Internal Revenue seeks to tax as income for 1922 the impounded moneys withdrawn in 1919.

In Rate Cases No. 2 the respondent and its subsidiaries began litigation in 1920 attacking the constitutionality of a New York statute known as the Eighty Cent Gas Law (Laws N. Y. 1906, c. 125). The United States District Court granted a temporary restraint against its enforcement and permitted collection of higher rates, requiring the excess to be impounded. Subsequently, in November, 1920 [(D. C.) 269 F. 452], an interlocutory order was entered finding the act confiscatory and permitting the impounded moneys to be withdrawn and future collections to be withheld from impounding upon substituting a bond or securities. A final decree in favor of the respondent was entered in May, 1921, and affirmed by the Supreme Court in March, 1922. Newton v. Brooklyn Union Gas Co., 258 U. S. 604, 42 S. Ct. 313, 66 L. Ed. 785. A final decree in favor of one of the subsidiaries, Newtown Gas Company, was entered in October, 1921, and the appeal therefrom was dismissed by consent in 1923. 263 U. S. 726, 44 S. Ct. 4, 68 L. Ed.

527. Final decrees in favor of the other subsidiaries were entered in September, 1922; and not appealed. Prior to 1922 and pursuant to court decrees, either interlocutory or final, all moneys in excess of the statutory rate were either withheld or withdrawn from impoundment upon the giving of bonds, with the exception of some $673,000, which was withdrawn in 1922 after the litigation had ended. The Commissioner seeks to tax as 1922 income all moneys in excess of the statutory rate collected during 1920 and 1921.

The question presented is whether the excess moneys represented income to the respondent and its subsidiaries, reporting on the accrual basis, in the year when the rate litigation was finally terminated, as the Commissioner contends on the ground that until then the right to such moneys was contingent. Rejecting this theory, the Board of Tax Appeals held that the excess moneys constituted income in the years when earned; that is, the years when the gas was furnished and the charges therefor were made against the consumers upon the companies' books. This resulted in allocating to income of years prior to 1922 some $8,600,000, thereby diminishing the tax deficiency which the Commissioner had determined for 1922. The appeal challenges this decision.

Were it not for the case of North American Oil Consol. v. Burnet, 286 U. S. 417, 52 S. Ct. 613, 76 L. Ed. 1197, we should unhesitatingly adopt the theory of the Board that the moneys in dispute were income in the year when the service was rendered. To that year was allocated the entire cost of manufacture and distribution of the gas, and to the same year should be attributed the whole price at which it was sold, if the taxpayer's profit on the transaction is to be accurately reflected by the accrual method of bookkeeping. The cases relating to compensation subsequently awarded to railroads for the years of federal control, upon which the Board relied, furnish a persuasive analogy. See Commissioner v. Old Dominion S. S. Co., 47 F.(2d) 148 (C. C. A. 2); Continental Tie & L. Co. v. United States, 286 U. S. 290, 52 S. Ct. 529, 76 L. Ed. 1111; compare Uncasville Mfg. Co. v. Commissioner, 55 F.(2d) 893 (C. C. A. 2), cert. denied, 286 U. S. 545, 52 S. Ct. 497, 76 L. Ed. 1282. But the North American Oil Case gives us pause. There a receiver was appointed to operate certain property pending the outcome of a suit brought to contest the taxpayer's title thereto. Net income produced from the receiver's operation of the property in 1916 was turned over to the taxpayer in 1917, upon the entry of a final decree dismissing the bill of complaint. The decree was appealed, and the litigation was not terminated until 1922. The taxpayer contended that the net profit should be allocated either to 1916 or 1922, but the court held it to be income for the year 1917, when it was received. While this case casts doubt upon the correctness of the Board's theory that the excess moneys are to be allocated to the years, respectively, when the gas was sold, it strongly supports the decision that final termination of the litigation was not the critical moment. As the Supreme Court said, at page 424 of 286 U. S., 52 S. Ct. 613, 615, 76 L. Ed. 1197:

"If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent."

■ We think this is conclusive against the Commissioner's contention with respect to the excess moneys which prior to 1922 were withheld or withdrawn from impoundment upon bonds fixed by the court. Such money was income, being payment for service already rendered, and was received by the companies without restriction upon its use. It is true they were subject to a contingent liability to pay back an equivalent amount if the rate litigation ultimately went against them. This liability, however, imposed no restriction upon their use of the money actually in their hands. Nor did the fact that they gave bonds to get it add anything to the contingent liability they were under regardless of such bonds. Termination of the rate litigation merely determined their right to retain income already received. See Board v. Commissioner, 51 F.(2d) 73, 76 (C. C. A. 6). The money received prior thereto cannot be taxed as income of the year 1922.

■ This disposes of all the moneys involved in Rate Cases No. 1 and of all the moneys involved in Rate Cases No. 2, except the $673,000 which was withdrawn from impoundment in 1922. This sum represented charges in excess of the statutory rate for gas furnished in 1920 or 1921. As to this the North American Oil decision tends to support the Commissioner's contention that the money was income in the year when received. However, two differences in the facts are to be noted: First, the North American Oil Case involved only net income resulting from the receiver's operations. The taxpayer there was not required to charge the re-

ceiver's expenses to 1916 while crediting his receipts to 1917. Hence there was no such distortion of the taxpayer's income as would result from applying the same rule to the case at bar. Here the entire cost of furnishing gas was charged to the year when the service was rendered, but on the Commissioner's theory only a part of the price charged to and collected from the consumer would be credited as income to that year; the remainder would be credited to income in 1922 and without carrying into that year any part of the expense of earning such income. Obviously this would produce an unfair distortion of the taxpayer's actual profits in each of the years. Secondly, in the North American Oil Case no court order was entered in 1916 finding that the taxpayer was entitled to funds in the receiver's hands. As the Supreme Court pointed out (286 U. S. at page 423, 52 S. Ct. 613, 76 L. Ed. 1197), there was no constructive receipt of the profits by the taxpayer in 1916, because at no time during that year had it a right to demand that the receiver pay over the money. In the case at bar, however, it was decided in November, 1920, that the statutory rate was confiscatory, and the respondent and its subsidiaries were declared to have a right to receive the impounded income without restriction, provided they filed bonds as security for their conditional liability to return a like sum. Their conditional right to get the impounded money could be turned into an absolute right at their own option. We do not think a taxpayer could alter at will the accrual of income by failing to exercise an option to receive it. A majority of the court believe that these differences in the facts are sufficient to distinguish the North American Oil Case, and that the order appealed from should be affirmed in toto. It is so ordered.

L. HAND, Circuit Judge (dissenting in part).

Even when the taxpayer has received the money, it is theoretically possible to treat the item as in suspense, until the right to it has been determined, or as an immediate receipt, with a corresponding deduction, if it is later repaid. But the second was authoritatively laid down in North American Oil Consol. v. Burnet, 286 U. S. 147, 52 S. Ct. 613, 76 L. Ed. 1197, as applicable to accounts kept either on an accrual, or a cash, basis. This answers the main issue, and my only difference with my brothers is as to that part of the moneys impounded in Rate Cases No. 2, which was never withdrawn until the suits were determined. If the right to withdraw had been unconditional, perhaps we ought to treat this as though it were already in the coffers of the companies; it was equally available. Indeed, even if the companies had been required to give their individual bonds, these would in substance subject them to no other liability than they were under anyway. But the interlocutory decrees which allowed the withdrawal of $673,000, required them to deposit securities of their own, or the bonds of a surety company. It can scarcely be said that this made the moneys immediately available, like cash on deposit. The condition required them either to turn over equivalent property to the court, or to assume an obligation to the surety, which often demands security. I do not see how such moneys are any more received by the taxpayers, than if the court continued to impound them.

It is sometimes possible, when accounts are kept on an accrual basis, to ignore the conditional character of the right, but that is just what, as I read it, was denied in North American Oil Consol. v. Burnet, in a closely similar situation; the right unaccompanied by possession or its equivalent was too contingent. I agree that in fact the uncertainties were no greater then than those determining the recovery in the Federal Control Cases.[1] But the distinction between the liquidation of a determined right, and the determination of a disputed right, is familiar throughout the law, though for practical purposes one may be as incalculable as the other. It is reasonable to import this distinction, taken in so many other situations. The "title" to the moneys was in genuine dispute; indeed the company's last efforts had been unsuccessful. To treat the impounded sums as presently accruable appears to me, therefore, to ignore a well recognized classification. As to $673,000 of the moneys in the Rate Cases No. 2, I therefore dissent; otherwise I concur.

[1] See Commissioner v. Old Dominon S. S. Co. (C. C. A.) 47 F.(2d) 148; Old Dominion S. S. Co., 16 B. T. A. 264; Great Northern Ry. Co., 8 B. T. A. 225; New Orleans, Texas & Mexico Ry. Co., 6 B. T. A. 436; Virginia Carolina Securities Corp'n, 6 B. T. A. 84; Cincinnati, Findlay & Fort Wayne Ry. Co., 5 B. T. A. 108; Illinois Terminal Co., 5 B. T. A. 15. See, also, Kansas City Southern Ry. Co., 16 B. T. A. 655; Western Maryland Ry. Co., 12 B. T. A. 889, and Missouri Pac. Ry. Co., 22 B. T. A. 267.