**GENERAL OUTDOOR ADVERTISING CO., Inc., v. HELVERING.**

**HELVERING v. GENERAL OUTDOOR ADVERTISING CO., Inc.**

**No. 207.**

Circuit Court of Appeals, Second Circuit.

May 10, 1937.

CHASE, Circuit Judge, dissenting in part.

———◆———

Greene & Hurd, of New York City (James L. Moore, James L. Dohr, and Malcolm C. Law, all of New York City, of counsel), for General Outdoor Advertising Co.

James W. Morris, Asst. Atty. Gen., and Sewall Key and John G. Remey, Sp. Assts. to Atty. Gen., for Commissioner of Internal Revenue.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This appeal raises two questions: (1) whether the taxpayer may deduct as an "ordinary and necessary" expense of its business payments for legal services in defending a suit against it and others brought by the United States under the Anti-Trust Acts (15 U.S.C.A. § 1 et seq.); and (2) whether it may deduct another payment made as hereinafter described, as "compensation for personal services actually rendered." Both deductions are controlled by section 23(a) of the Revenue Act of 1928 (26 U.S.C.A. § 23 and note). As to the first, we need add nothing to what we said in the companion case of National Outdoor Advertising Bureau, Inc., v. Helvering, 89 F.(2d) 878, for the taxpayer was a party to the same suit. The order must therefore be reversed upon the Commissioner's appeal, and the cause remanded for apportionment of the payments as there provided.

The second point arises as follows. The taxpayer wished to install a system of added compensation for some of its employees, "managers and executives," and to that end devised the following plan. In 1929 it organized a company whose shares it took up at the cost of $40, contributed, $15 in cash by itself, and $25 in notes or cash by the employee to whom the share was to be allotted. The shares were issued to the taxpayer, which agreed to pay the allottee an amount equal to all dividends declared upon his allotment, so long as he was in its employ, and he was to have the power to vote upon five-eighths of the shares allotted to him. When he left the service he was to receive the book value of the shares as they then stood, unless his "employment terminated for cause resulting in loss" to the taxpayer, in which event he was to receive at least twenty-five dollars a share and as much more as the taxpayer's directors might choose to give him. In token of his rights he received a certificate. It was expected that the new company should invest its funds in voting certificates of the taxpayer's own shares (though this was not obligatory), and the taxpayer agreed to contribute in addition to the new company a certain percentage of its net profits, and to divide a similar amount directly among the allottees. The taxpayer carried out the plan, and sought to deduct that part of the

subscription which came out of its treasury as "compensation for personal services" under section 23(a). The Board said no; it thought that the critical fact was the retention by the taxpayer of title to the shares; since the allottees had no interest in these save by virtue of the arrangement just outlined, the taxpayer had parted with nothing, and being affiliated with the new company the transaction as between the two went into hotchpot and was cancelled out.

It seems to us that this was too formal a view to take of the transaction; the true determinant is not the title to the shares, but whether the payment was a contribution irrevocably devoted to the allottees, who in that case received it as employees. It was not indeed so contributed without possible recall, for it will have been observed that if they left the taxpayer's service "for cause resulting in loss" to it, they forfeited everything except their own contribution to the subscription price, and so much else as the directors might allow as matter of grace. Except for that chance, however, the taxpayer's payment was theirs. A difficulty might have arisen, had the funds been used to subscribe for new shares of the taxpayer, since the result in effect would then have been to issue those shares for the allottees' contribution alone, and that would scarcely have involved any payment out of its treasury. But that was not the plan; the new company was to buy voting certificates of outstanding shares; the taxpayer's treasury was irrecoverably depleted, and the allottees were enriched by the payment, save for the possibility of recoupment mentioned above.

Therefore, the only question is whether that condition introduced enough uncertainty into the finality of the payment to cancel it as a present deduction, the taxpayer keeping its books on an accrual basis. That is the same problem which has often arisen, either as to an item of income, subject to possibility of restitution in a later year, or as a deduction for which the taxpayer may later recoup. It results from the necessity of stating the income yearly; when accounts are on a cash basis it cannot arise. In the case at bar the specific question is whether or not to regard the payment as held in suspense until the employee left the taxpayer's service, when for the first time it would become certain whether it would ever be recouped. Such situations may be of two kinds. The obligation may be absolute, but so uncertain in amount as not to be presently computable. In that class of cases the courts have gone far to treat it as immediately chargeable or deductible. United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347; Continental Tie & Lumber Co. v. U. S., 286 U.S. 290, 299, 52 S.Ct. 529, 532, 76 L.Ed. 1111; Commissioner v. Old Dominion S. S. Co., 47 F.(2d) 148 (C.C.A.2); Baltimore & Ohio Ry. Co. v. Commissioner, 78 F.(2d) 456 (C.C.A.4). On the other hand the condition may attach to the obligation itself. In those cases it is hard to break out a rule from the decisions. In United States v. S. S. White Dental Co., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120, the taxpayer was allowed its loss, though it had a possible recoupment—eventually realized —against the German government after the war. In Lucas v. American Code Co., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538, 67 A. L.R. 1010, the loss was more than uncertain in amount; there was genuine doubt whether the employee could recover at all. We interpret Lucas v. North Texas Lumber Co., 281 U.S. 11, 50 S.Ct. 184, 74 L.Ed. 668, as depending on the assumption that the contract was conditional until the deeds were delivered. In North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197, the possibility of reversal of the decree under which the payment had been made, did not suspend it as a charge, though it was not such until decree in the district court. We followed this decision in Commissioner v. Brooklyn Union Gas Co., 62 F.(2d) 505, and we do not consider its scope limited by Freuler v. Helvering, 291 U.S. 35, 54 S.Ct. 308, 78 L.Ed. 634, which turned upon the language of the section taxing the beneficiaries of a trust. The closest to the case at bar which we have found is Brown v. Helvering, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725, where an insurance agent was not allowed to set off against earned commissions a reserve for cancellations though past experience permitted it to be closely forecast. It was not enough that for bookkeeping purposes such forecasts had an actuarial basis that justified their treatment as present items. That decision therefore stands for a stricter rule than we need here impose, where it is altogether impossible to know whether an employee will cause loss to the taxpayer. See, also, Shapleigh Hardware Co. v. United States, 81 F.(2d) 697 (C.C.A.8). In Vang v. Lewellyn, 35 F.(2d) 283 (C.C.A.3), and Highland Milk Condensing Co. v. Phillips, 34 F.(2d) 777 (C.C.A.3), the taxpayer

was not allowed to deduct possible payments which might become due under his guarantees of performance. The result in Commissioner v. R. J. Darnell, 60 F.(2d) 82 (C.C.A.6), is perhaps open to doubt. At all events, it seems to us that the condition here was too remote to be considered; practically the taxpayer had only a remote chance to regain what it paid, and taxation, we are told, is a practical matter.

We have a little oversimplified the case by omitting another condition. It was provided that if any allottee defaulted in the payment of his notes, or left the service before they were paid, he was to have nothing more than what he paid in. That in form was indeed a condition upon the finality of the taxpayer's own payment, but it seems to us a remote one, for it would be an unusual case—if the new company's shares had any equity at the time—that the allottee would be unable and unwilling to complete his payments, especially in case he were leaving the service. If, on the other hand, the value of the shares had gone down at the time of the forfeiture, so that there were no equity, the original contribution of the taxpayer would be already lost, for the allottee had in effect a lien, quoad the taxpayer, to the extent of his payments. It does not therefore seem to us that this refinement substantially changes the situation. The only conclusion we can make from the decisions is that the result turns upon the degree of uncertainty of the future obligation. In this case it was so uncertain that it must be suspended until the event, when the taxpayer, if it recoups, will be obliged to charge the amount recaptured as part of its income for that year.

Order reversed upon the taxpayer's appeal and deduction allowed.

Order reversed upon the Commissioner's appeal and cause remanded to apportion the deduction.

CHASE, Circuit Judge (dissenting in part).

I agree with the disposition of the first point providing for the apportionment of the expenses for legal services and the allowance of a deduction only for those which may be found necessary when the rule of National Outdoor Advertising Bureau, Inc., v. Helvering (C.C.A.) 89 F.(2d) 878, is applied.

But I cannot agree to allow any deduction for the taxpayer's contribution to the purchase of the shares of the corporation organized to carry out the added compensation plan, since I think this was shown to have been an investment rather than additional compensation to employees.

To the purchase of those shares the taxpayer contributed a part; the employees the remainder and they received not the shares but allotment certificates. The taxpayer acquired the legal title to the shares and was bound only to pay to the certificate holding employees, so long as they remained in its employ, an amount equal to the dividends received. If any employee relationship was severed for any reason there was to be an adjustment in respect to the shares concerned but that in no event was to be more than a payment of cash to the employee. The taxpayer promised to return the contribution of the employee and more, if the stock was then worth more, provided the termination of employment caused the taxpayer no loss.

Yet whatever may eventually be the amount the taxpayer will have to pay on account of any share it will still own that share and the payment will not exceed its book value. What any shares may cost the taxpayer is dependent upon future events too uncertain for present computation. Likewise, what may be realized by the taxpayer when, if ever, it finally disposes of the shares themselves cannot now be foretold. It has, as yet, merely given up the dividends on the shares for the benefit of its employees. That is, it has frozen its investment subject to a contract whose performance in the future is in terms to be governed by future happenings presently too uncertain to be given any effect for the purposes of taxation. When the taxpayer makes a final disposition of some, or all, of its shares, and only then, can the result be known and reflected in its then current computation of taxable income. That result may give it additional income or a deductible loss or neither. I would affirm the decision of the Board of Tax Appeals on this point.