THE NORTH PENNSYLVANIA RAILROAD COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
North P. R. Co. v. Commissioner
Docket No. 16803-80.
United States Tax Court
T.C. Memo 1983-731; 1983 Tax Ct. Memo LEXIS 55; 47 T.C.M. (CCH) 549; T.C.M. (RIA) 83731; December 8, 1983. *55 In 1879, P railroad leased all its property to R railroad for 990 years. Under the lease, R agreed to pay all local property taxes imposed on the leased property. In November, 1971, R sought protection of the bankruptcy courts and thereafter ceased paying the property taxes and rent. From 1972 through April 1, 1976, P accrued and deducted unpaid property tax liabilities and interest thereon. On April 1, 1976, most of the leased premises were involuntarily transferred to the Consolidated Rail Corp. ("Conrail"). On that day, R agreed to lend P money sufficient to pay the accrued property taxes. Such loans would be repayable only out of the proceeds of Conrail's award to P to the extent that award exceeded $8,173,425. From 1978 through 1982, R fully paid all the accrued property taxes and interest. In 1982, P received the Conrail award and repaid R's advances. Held, the April 1, 1976, agreement did not generate income to P in 1976. Another part of the 1879 lease provided that if R no longer needed certain leased property for railroad purposes, it could, with P's consent, sell such property. The proceeds of such sales would be applied only to retire P's mortgages and bonds. *56 R's rent, in turn, would be reduced by an amount equal to the interest charged on such retired bonds. P argues that R was required to report 100 percent of the capital gain on such sales in 1975 and 1976 and that P received discharge of indebtedness income in such sales which it properly elected to exclude from income under section 108, I.R.C. 1954. Respondent argues that P was required to report 50 percent of the capital gain on such sales and that P realized ordinary income from R's retirement of P's bonds in an amount equal to half the proceeds of such sales. Held, P was required to report 100 percent of the gain on such sales. Held further, the application of the proceeds of such sales toward the retirement of P's bonds had no further tax significance to P. Thomas E. Tyre, for the petitioner. Robert W. Lynch, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined a deficiency in petitioner's Federal income taxes for the taxable year 1976 of $398,682. The issues for decision are 1) whether petitioner realized income under the tax benefit rule or claim of right doctrine in 1976 when Reading Company agreed to make payments to local *57 taxing authorities in satisfaction of petitioner's previously deducted unpaid real estate taxes and interest, 2) the extent to which petitioner realized gain in 1975 [1] and 1976 when Reading Company sold certain of petitioner's leased real property and 3) whether petitioner received discharge of indebtedness income in 1975 and 1976 subject to exclusion from gross income under section 108 n1a when Reading Company applied the proceeds of the above sales to retire petitioner's bonds. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by reference. Petitioner North Pennsylvania Railroad Company is a corporation chartered by the legislature of the Commonwealth of Pennsylvania in 1852 to build and operate *58 a railroad in the Commonwealth. At the time the petition was filed, petitioner maintained its principal office at Philadelphia, Pennsylvania. In 1879, after its railroad was constructed, petitioner leased all of its properties to The Philadelphia and Reading Railroad Company for a period of 990 years. By the time of the years in issue, the Reading Company ("Reading") had succeeded to the interest of The Philadelphia and Reading Railroad Company to lessee under the above lease. The lease provided, interalia, that Reading pay a fixed rental, [2] *59 pay all taxes assessed against the demised premises and pay the interest on petitioner's real estate mortgages. Upon termination of the lease, Reading was to return the property to petitioner in good condition. If Reading made improvements to the leasehold, petitioner was required to issue to Reading either bonds or petitioner's common stock in an amount equivalent to the cost of the improvements. During the taxable years here involved, Reading owned approximately 31 percent of petitioner's capital stock. Paragraph Thirteenth of the lease provided: [3]
THIRTEENTH. --That the said party of the second part [Reading] may, at any time hereafter, with the consent of the party of the first part [petitioner], which shall be evidenced by its becoming a party to the conveyance, sell and convey the whole or any part of the real estate hereby demised, which shall, in the opinion of [Reading], be unnecessary for the purpose of carrying on business over the railroad hereby demised-- Provided, That the proceeds of any such sale shall be applied first to the payment of any incumbrance upon the property so sold, for the payment of which the [petitioner] may be liable, and the surplus, if any, to the payment or purchase of any of the bonds of [petitioner] which may be secured by any now existing mortgage upon the railroad hereby demised, or any part thereof, and its appurtenances, (which bonds shall thereupon be cancelled,) and thereafter the annual rental payable by [Reading] to [petitioner] shall be decreased *60 by an amount equal to the annual interest payable upon the bonds so cancelled. Petitioner retained the title ownership of all real properties subject to the lease. In November, 1971, Reading sought the protection of Section 77 of the Bankruptcy Act (11 U.S.C. sec. 205 (1976)), and its affairs thereafter were managed by trustees appointed by the United States District Court for the Eastern District of Pennsylvania sitting in bankruptcy. At that time, Reading, pursuant to various court orders, ceased paying rent to petitioner although thereafter it continued *61 to operate petitioner's properties. Additionally, Reading ceased paying taxes assessed against the properties used in the Reading system, including those belonging to petitioner. The Court enjoined local taxing authorities from taking any action, absent further Court order, to foreclose on Reading's property or any property used by Reading because of Reading's failure to pay local taxes or make reimbursement for such taxes. The District Court permitted the trustees to postpone any decision regarding the affirmation or disaffirmation of the lease between Reading and petitioner. As of April 1, 1976, the lease had neither been affirmed nor disaffirmed. Similarly, at that time, petitioner's properly filed claims for unpaid rents had neither been approved nor disapproved. On January 2, 1974, the Regional Rail Reorganization Act of 1973, Pub. L. 93-236, 87 Stat. 985 (codified at 45 U.S.C. sec. 701, et seq. (1976)) became law. This Act, as extensively amended by the Railroad Revitalization and Regulatory Reform Act of 1976 Rub. L. 94-210 and 94-216, 90 Stat. 31 and 191 (February 5 and 17, 1976), established a Consolidated Railroad Corporation ("Conrail") to acquire and operate rail *62 properties in certain designated parts of the United States. Railroads whose properties were transferred to Conrail were to be compensated through the receipt of an equivalent value of stock and/or securities of Conrail and certificates of value of the newly created United States Railway Association ("USRA"). Pursuant to the Acts, the USRA was to develop a final system plan determining which rail properties should be transferred to Conrail and the value of compensation to be paid for such properties. 45 U.S.C. secs. 712(a)(1) and 716(c) and (f) (1976). After the final system plan was implemented, a transferor railroad dissatisfied with the amount of its compensation could litigate the size of the award in a special court. 45 U.S.C. sec. 743 (c) (1976). Ultimately, the special court would order distribution of the appropriate compensation. 45 U.S.C. sec. 743(c)(4) (1976). Certificates of value were essentially based on the transferor's net liquidation value. 45 U.S.C. sec. 746(c)(4). Petitioner and Reading were both named as transferor railroads in the USRA's final system plan dated March 1, 1976. In the plan, the USRA determined that petitioner's net liquidation value was *63 $5,573,425. Both petitioner and Reading transferred all their railroad operating properties to Conrail on April 1, 1976. Petitioner contested the size of its valuation award in the special court. It introduced evidence in that proceeding through expert witnesses that its operating properties acquired by Conrail had a value in passenger service of approximately $32 million and in freight service of approximately $47 million. By agreement dated September 30, 1981, among petitioner, the USRA and the United States, petitioner settled its valuation litigation for certificates of value in aggregate principal amount of $21,593,547 plus interest of $11,932,390 as of December 15, 1981. In an agreement dated April 1, 1976, petitioner and Reading terminated the 990-year lease, causing all properties subject to the lease to revert to petitioner free and clear. The agreement, in pertinent part, stated: 4. * * * At the Closing, Reading will advance to North Penn [petitioner] $2,600,000, which sum will not bear interest and will be repayable only out of the proceeds referred to in paragraph 5(b) below.Reading will also advance, from time to time, such sums as may be necessary to pay (and will *64 hold [petitioner] harmless against) (a) all real estate taxes (plus any interest and penalties) and other charges against the [petitioner's] rail properties which are the responsibility of [petitioner] under the conveyance order of the Special Court, and (b) to the extent attributable to the period prior to April 1, 1976, all real estate taxes (plus any interest and penalties) and other charges against [petitioner's] non-rail properties. Such advances will not bear interest and will be repayable only out of the proceeds referred to in paragraph 5(c) below. 5. The proceeds recovered by [petitioner] [in its special court valuation award] will be distributed as follows: (a) The first $5,573,425 will be retained * * * by [petitioner].
(b) The next $2,600,000 will be paid by [petitioner] to Reading to repay the $2,600,000 advance referred to above.
(c) The next $2,973,425 will be paid by [petitioner] to Reading. Such payment will be deemed repayment of the advances for real estate taxes and other charges referred to above, to the extent of such advances. (d) Fifty percent of any proceeds in excess of $11,146,850 will be retained * * * by [petitioner]; and fifty percent of any such excess *65 will be paid by [petitioner] to Reading. Further, the agreement provided that petitioner would sell all its remaining non-rail property not conveyed to Conrail and would divide the sales proceeds (and any interim rentals) evenly between itself and Reading. The April 1, 1976, agreement was approved by the Bankruptcy Court on July 27, 1976. In 1978 and 1979, Reading settled some of the claims for unpaid real property taxes accrued against petitioner's properties for the period prior to April 1, 1976, by the payment of 30 percent thereof in cash and the agreement by some of the taxing jurisdictions to accept the balance in securities issued in the valuation case award to Reading, contingent upon the total amount of said award as determined by the special court. Reading settled its own valuation suit on July 31, 1981, for $85 million.In October, 1981, Reading undertook to settle all arrearages of property taxes with local authorities. By April 30, 1982, all such arrearages had been either fully paid in cash or provided for by Reading's agreement to redeem securities, including interest and penalties, up to and including December 31, 1977. In anticipation of its imminent receipt of *66 its own valuation award petitioner, on October 31, 1981, entered into a revised agreement with Reading which essentially provided for an even division of petitioner's valuation award between itself and Reading. Under the terms of this new agreement, the payments to Reading would result in the discharge of petitioner's obligations under paragraphs 4 and 5(c) of the April 1, 1976, agreement. On February 19, 1982, petitioner received its valuation award in certificates of value which were immediately redeemed by the governmental agencies for cash. Half of the cash ($17,001,873.50) was paid to Reading and the other half ($17,001,873.50) to petitioner.
Petitioner is an accrual basis taxpayer. In preparing and filing its Federal income tax returns prior to 1972, petitioner did not report as rental income Reading's payments of real property taxes imposed on the demised premises. Neither, in that period, did petitioner claim deductions for the payment of real estate taxes attributable to Reading's payment of those taxes. From January 1, 1972, until April 1, 1976, petitioner accrued unpaid real estate taxes on the leased property and interest thereon in the respective amounts of $671,495 *67 and $120,400. Petitioner claimed deductions for these amounts on its Federal income tax returns for the taxable years 1972 through 1976, inclusive. For the taxable years 1972, 1973 and 1974, petitioner reported net operating losses which were carried back to prior taxable years and resulted in refunds to petitioner of taxes previously paid for 1969, 1970 and 1971 totalling $477,334. In years prior to 1975, when Reading had, with petitioner's consent, sold unneeded portions of the leased real estate, Reading used the proceeds to help retire petitioner's outstanding bonds pursuant to Paragraph Thirteenth of the lease. Reading reported the gain, if any, from such sales on its income tax returns.Petitioner elected under sections 108 and 1017 and their predecessors to adjust the bases of its remaining properties to the extent of the gain realized on such sales. For the taxable years 1967 through 1974, inclusive, respondent questioned the allocation of such sale proceeds between petitioner and Reading. Pursuant to settlement agreements with the Appellate Division of the Internal Revenue Service, 50 percent of the gains realized on the sales were allocated to petitioner and 50 percent *68 to Reading. When the total sale proceeds were used to retire petitioner's bonds, respondent did not dispute that the bases of the remaining properties would be reduced, pursuant to elections under sections 108 and 1017, by the 50 percent of the proceeds allocated to Reading and that petitioner would be allowed to report the 50 percent of the proceeds allocated to it as taxable capital gains. In 1975 and 1976 (prior to April 1, 1976), Reading sold unneeded leased property and used all the proceeds of such sales to help retire petitioner's outstanding bonds. On its 1975 and 1976 returns, petitioner reported 50 percent of the gain on such sales as capital gain. Petitioner elected to adjust the bases of its remaining properties, pursuant to sections 108 and 1017, by the 50 percent of the sale proceeds allocated to Reading and used by Reading to retire petitioner's bonds. In his statutory notice of deficiency, respondent determined that the April 1, 1976, agreement between petitioner and Reading constituted an assumption by Reading of petitioner's previously deducted real estate tax and interest liabilities. Pursuant to section 111, respondent determined that this assumption produced *69 $791,895 of additional income to petitioner in 1976. Respondent further determined that all the proceeds of the sales of petitioner's property used by Reading to retire petitioner's bonds constituted reportable ordinary income to petitioner in the respective amounts of $56,555 in 1975 and $139,259 in 1976. OPINION This case involves the application of a series of fundamental tax accounting rules to a confused and complex set of facts. Over the years during which the corporate income tax has existed, petitioner and respondent have compromised on certain methods of tax accounting for petitioner's income which, to say the least, might be called creative. The form of settlement once acceptable to both parties, however, has now come undone. All issues in this case arise out of a 990-year lease entered into by petitioner, as lessor, and Reading, as lessee, in 1879. Neither petitioner nor respondent contends that this document should be treated for tax purposes as anything other that a lease. [4] *70 Consequently, we also treat it as a lease. See United States v. Boston & M.R. Co.,279 U.S. 732 (1929) (99-year lease between railroads recognized).
The first issue concerns Reading's April 1, 1976, agreement to make advances to petitioner for payment of all real estate taxes and interest imposed on the leased premises for the period January 1, 1972, through April 1, 1976, but subject to reimbursement by petitioner. At the time of the agreement petitioner had accrued and deducted $791,895 in taxes and interest on its returns for the years 1972 to 1976, inclusive, although no actual tax or interest payments were made in those years. 4a
Respondent *71 does not challenge the propriety of petitioner's deductions. He does argue, though, that in the April 1, 1976, agreement, Reading assumed petitioner's accrued real estate tax and interest liabilities and that therefore petitioner "recovered" these previously deducted amounts. This assumption, he contends, generated income in the amount of $791,895 under the tax benefit rule.Alternatively, respondent argues that petitioner received $791,895 as income under the claim of right doctrine on April 1, 1976, because petitioner never intended to reimburse Reading for the promised tax and interest payments or because the promised reimbursement of Reading was too contingent. Petitioner responds, first, that the tax benefit rule does not apply because no event occurred in 1976 which was fundamentally inconsistent with petitioner's deductions.Second, petitioner construes the April 1, 1976, agreement as merely a promise by Reading to make advances to petitioner. Loans do not ordinarily generate taxable income, says petitioner. Third, petitioner argues that any income it might have realized from Reading's April 1, 1976, promise did not occur until at least 1978 when tax payments were first made *72 to local taxing authorities and that, in any event, because of the repayment contingency, Reading's advances should be considered open transactions producing no income to petitioner until the repayment contingency was resolved in 1982. Respondent contends that the April 1, 1976, agreement relieved petitioner of its obligation to pay its accrued real estate taxes and interest. Thus, citing Mayfair Minerals, Inc. v. Commissioner,56 T.C. 82 (1971), affd. per curiam 456 F.2d 622 (5th Cir. 1972), respondent contends petitioner had tax benefit rule income in 1976 in the amount of these previously deducted items. Without question, if the April 1, 1976, agreement can be construed to impose an obligation upon Reading to pay petitioner's accrued taxes and interest without right of reimbursement, such obligation would have to be scrutinized to determine whether Reading's obligation would constitute some form of taxable income, reportable by petitioner in 1976. See, e.g., section 1.162-11(a), Income Tax Regs.; [5]United States v. Boston & M.R. Co.,supra (payment of taxpayer's Federal income tax liability by lessee constituted additional rental income); Old Colony Trust Co. v. Commissioner,279 U.S. 716 (1929) *73 (payment of taxpayer's Federal income tax liability by employer constituted additional compensation). However, since we ultimately conclude, as discussed infra, that the April 1, 1976, agreement required that petitioner pay its own taxes and interest, there is no reason to pursue a further inquiry into whether any income inured to petitioner, and the nature thereof, by reason of the agreement. Thus, the ramifications of the tax benefit rule and the claim of right doctrine fall by the wayside in this case. There is no evidence that petitioner's accrued property tax liabilities were terminated by the April 1, 1976, agreement or by any other event occurring in 1976. The agreement itself only provided a method by which those liabilities would be paid in full. In effect, the agreement provided that Reading would act as petitioner's agent in paying petitioner's taxes. Further, there is no evidence that the local *74 taxing authorities ever relieved petitioner of its tax liabilities in 1976 or at any time. The court order in Reading's bankruptcy proceeding merely enjoined local authorities from instituting proceedings to collect the taxes due on properties used by Reading without a further court order. Although the local authorities may or may not have expected Reading ultimately to make the tax payments, there is nothing in this record indicating that the various jurisdictions no longer held petitioner primarily liable for such payments. Petitioner contends that on April 1, 1976, Reading merely agreed to make nonrecourse loans to petitioner of the funds necessary to pay the local property taxes and interest.Petitioner points out that the receipt of the proceeds of a loan does not usually generate taxable income. Commissioner v. Tufts, 461 U.S.    ,     (1983). [6] *75 Respondent, on the other hand, contends that in substance petitioner would never repay these loans and that, therefore, petitioner realized a taxable accretion to its wealth equal to the amount of the promised funds. [7] The agreement itself terms Reading's promised tax payments as advances which would be repayable out of the proceeds of petitioner's valuation award to the extent such award exceeded $8,173,425. [8] On its face, then, the agreement provides for the repayment of the loans. Respondent, contends, however, that we should look behind the words of the agreement and see that, in substance, the agreement provides that Reading and petitioner would split the valuation award evenly to compensate Reading for its cancelled leasehold interest. He argues that none of the valuation award would be used to pay back the tax and interest advances. As support for this argument, respondent points out *76 that paragraph 5(c) of the agreement states that $2,973,425 of the valuation award received after the first $8,173,425 was to be paid to Reading and "deemed repayment of the advances for real estate taxes and other charges," although petitioner's accrued tax and interest liabilities then only equaled $791,895. Further, he notes that the October 31, 1981, agreement between Reading and petitioner divided the proceeds of petitioner's valuation award essentially evenly. We cannot agree with respondent's argument. The April 1, 1976, agreement had several purposes beyond merely that of compensating Reading for the loss of its leasehold interest. We cannot ignore these other provisions or rewrite the agreement. The valuation award was to be divided in a stated fashion: first, petitioner was to receive $5,573,425; second, Reading was to be reimbursed for a $2,600,000 loan which it was to extend to petitioner at the closing of the agreement; [9] third, Reading was to be reimbursed for its advances to pay property taxes andothercharges; and finally, the remaining award was to be divided by giving Reading 100 percent of the award not used to reimburse advances up to the $11,146,850 level *77 and 50 percent of the award thereafter. There is simply nothing in the agreement or even the economics of the situation which would compel petitioner to give exactly half its valuation award to Reading as compensation for the latter's leasehold interest. Further, the fact that petitioner and Reading eventually split the valuation award evenly is not suspicious, since in light of the size of the award that is what the April 1, 1976, agreement called for. In sum, we find no reason to question the provision of the April 1, 1976, agreement providing for repayment of Reading's advances out of petitioner's valuation award. We next consider whether the nonrecourse loan obligation imposed on Reading in the April 1, 1976, agreement was so contingent regarding repayment that all or a part of the obligation constituted income to petitioner in 1976. As was noted above, it is usually the case that the receipt of loan proceeds does not produce taxable *78 income to the borrower. Commissioner v. Tufts,supra. This is true, "even when the source of repayment is limited to particular property and involves no personal liability." Minnis v. Commissioner,71 T.C. 1049, 1056 (1979); Falkoff v. Commissioner,62 T.C. 200, 206 (1974). Respondent, however, seeks to have petitioner recognize income at the time Reading became obligated to make the nonrecourse loans because at that time their repayment was contingent on the valuation award exceeding $8,173,425 and the USRA had only determined a $5,573,425 valuation award. Respondent cites no case in which bona fide loan proceeds were held to immediately [10] *79 create income to the borrower when repayment of the proceeds depended upon future events. More to the point, respondent cites no case in which the obligation to make loans immediately created income to the future borrower when repayment of such loans would depend upon future events. The only case respondent does cite is Commissioner v. Brooklyn Union Gas Co.,62 F.2d 505 (2d Cir. 1933), affg. 22 B.T.A. 507 (1931), involving the application of the claim of right doctrine to alleged customer service overcharges. There may indeed be cases where the repayment of a nonrecourse loan is so contingent at the time it is made as to call into question the bona fides of the parties' characterization of the transaction. [11] *80 However, we do not believe this to be such a case. In Graf v. Commissioner,80 T.C. 944, 948 (1983), we stated that a nonrecourse loan repayable only out of the future profits of a venture will be recognized "[o]nly when, in an objective sense, there is a reasonable certainty that full repayment will occur." Thus we ask, was there a reasonable certainty as of April 1, 1976, that the Special Court valuation award would be sufficient to assure repayment of Reading's promised advances? In prior cases we have often received testimony on the question of the likelihood of repayment of a nonrecourse note as of the date of its creation. See, e.g., Fox v. Commissioner,80 T.C. 972 (1983), on appeal (2d, 3d and 4th Cir., August 10, 1983). In the instant case, neither party has produced such testimony. We do know, however, that as of April 1, 1976, *81 the USRA by appraisal valued petitioner's taken property at $5,573,425 and that petitioner's appraisal experts valued it at between $32 million and $47 million. Both the USRA and petitioner were interested parties and thus both valuations merit cautious scrutiny. Unfortunately, we lack any evidence of how the appraisals in question were made. In such circumstances, our best estimate of the likely award of the special court must come from the subsequent action of the USRA and petitioner in settling petitioner's litigation for nearly $22 million, plus interest of $12 million. Since the settlement was arrived at through adversarial bargaining, it is the only objective basis in our record for estimating the likely outcome of the special court litigation.We note that this settlement award is many times the amount of the award necessary to trigger full repayment of the promised Reading tax and interest advances. Given this state of our record, it would appear then that the repayment contingency in petitioner's 1976 agreement with Reading created a reasonable certainty of full repayment. We therefore find that the April 1, 1976, agreement created a valid debt obligation on the part of *82 petitioner. In sum, Reading's April 1, 1976, agreement to pay petitioner's taxes and interest did not generate additional taxable income to petitioner. The next issue arising out of the 990-year lease concerns the sale of leased property. Paragraph Thirteenth of the lease allowed Reading, with petitioner's consent, to sell off any part of the leased premises no longer needed for railway purposes. In the event of such sales, the proceeds would be applied, first, to pay off third party mortgages for which petitioner was liable and, second, to retire petitioner's bonds. At the same time, Reading's total rental payments would be reduced by an amount equal to the annual interest payable on the bonds retired. For years prior to 1975, when Reading had sold leased property pursuant to Paragraph Thirteenth, it had applied all the proceeds toward retiring petitioner's outstanding bonds. The parties have stipulated that for tax purposes Reading reported the gain, if any, from such sales on its income tax returns; petitioner reported none of such gain. The parties have not informed us what basis Reading employed in determining the amount of the gain it reported, but from what we can glean *83 from the record Reading used petitioner's basis. Although petitioner reported none of the gain, it believed that its receipt of the sale proceeds to cancel its bonds constituted income to it from the discharge of indebtedness. See section 61(a)(12). To avoid reporting this income currently, petitioner filed elections under sections 108 and 1017 and adjusted the bases of its remaining properties downward to the extent of the gain realized on such sales.
For the taxable years 1967 through 1974, inclusive, respondent challenged petitioner's reporting method for such sales. Pursuant to settlement agreement reached at the Appellate Division of the Internal Revenue Service, it was agreed that petitioner should report 50 percent of the gain on such sales and that Reading should report the remaining 50 percent. Since petitioner was still receiving 100 percent of the sale proceeds to retire its bonds, petitioner now believed it had income from the discharge of indebtedness to the extent of the 50 percent of the proceeds allocable to Reading. Petitioner elected under sections 108 and 1017 not to report this income and instead adjusted the bases in its remaining properties downward by that *84 amount. Respondent did not challenge the nonreporting of this alleged income from the discharge of indebtedness or the section 1017 basis adjustments. In 1975 and 1976 (prior to April 1, 1976), Reading sold off additional leased properties no longer needed for railway purposes. All the proceeds of such sales were used to retire petitioner's outstanding bonds. On its tax returns for each of these years, petitioner reported 50 percent of the gain on the sales as capital gain and elected, under sections 108 and 1017, to adjust the bases of its remaining properties downward by the 50 percent of the sale proceeds it allocated to Reading. In his statutory notice of deficiency, respondent determined that all the proceeds of the sales of petitioner's property used by Reading to retire petitioner's bonds constituted reportable ordinary income to the petitioner in the respective amounts of $56,555 in 1975 and $139,259 in 1976. Respondent contends that such income is either rental income or income that arises when a third party pays a taxpayer's debt. See Old Colony Trust Co. v. Commissioner,supra. In neither case, respondent argues, is the income excludable under section 108 as income *85 from the discharge of indebtedness.[12] *86 Petitioner, on the other hand, now contends that it erroneously reported the 50 percent of the capital gain realized on the sale of leased property in 1975 and 1976 and that it is therefore entitled to a refund of taxes paid. Petitioner argues that Reading should have reported 100 percent of the gain on such sales and that all proceeds of such sales used to retire petitioner's bonds constituted discharge of indebtedness income excludable *87 from petitioner's income by virtue of its elections under sections 108 and 1017. Alternatively, petitioner contends that Reading's payments to satisfy petitioner's bonds constituted a nontaxable contribution by Reading to petitioner's capital; see section 118(a); or are reportable as gross income by petitioner only to the extent of petitioner's interest in the properties sold. Petitioner contends that its interest in the properties sold was so infinitesimal as to be equal to zero for tax purposes. We disagree with both parties. The starting point on this issue is the amount of capital gain reportable by petitioner upon the 1975 and 1976 sales of its unneeded leased property. If the gain was all reportable by petitioner, then all the sales proceeds were its own money. Needless to say, the use of one's own money to retire one's own bonds at full face value does not produce taxable income. Ordinarily, when rental property is sold the lessor reports all the capital gain or loss produced. See, e.g., Commissioner v. Tufts,supra.On occasion, a lessor may desire to sell his property unencumbered by its lease. To do this, the lessor and lessee must come to an agreement to terminate *88 the lease.If the lessee is not currently using the property, or for various other reasons, he may be willing to give up his leasehold interest to escape future rent obligations without demanding any payment from the lessor for cancelling the lease.In some cases it is necessary for a lessee to pay the lessor to obtain cancellation of a lease; such payments are treated by the lessor as accelerated rental income. See section 1.61-8(b), Income Tax Regs.; Hort v. Commissioner,313 U.S. 28 (1941). On the other hand, a lessee who objects to the cancellation of a lease may be willing to accept consideration from the lessor for the lessee's agreement to cancellation. See, e.g., Golonsky v. Commissioner,16 T.C. 1450 (1951), affd. 200 F.2d 72 (3d Cir. 1952). See also section 1241, allowing the lessee to treat the amounts so received as capital gain. In the instant case, when Reading disposed of leased property under Paragraph Thirteenth it was attempting to extricate itself from the burden of continuing rental payments on property no longer productive in its business. The substance of these transactions is no different from that where a landlord and tenant agree to cancel a lease at no cost *89 to either party and then the landlord immediately sells the leased property and receives all the sale proceeds. In such circumstances, there is no income to either the landlord or tenant on the cancellation of the lease, but the landlord reports all the gain on the sale. In effect, under Paragraph Thirteenth, Reading merely acted as petitioner's sales agent for property in which Reading and petitioner no longer desired to hold an interest. [13] *90 The parties do not suggest that the fact that Reading was in bankruptcy reorganization and the lease had neither been affirmed nor disaffirmed in 1975 and 1976 (prior to April 1, 1976) renders the substance of the sales at issue any different from the substance of sales performed under Paragraph Thirteenth prior to November, 1971. Indeed, so far as the record reveals, petitioner and Reading treated the sales occurring during Reading's bankruptcy proceedings exactly as if Paragraph Thirteenth were still in effect. We see no basis whatsoever for holding that Reading, the lessee, was required to report any of the gain on the sale of petitioner-lessor's property. Petitioner has not argued that we should ignore the lease and treat Reading as the true owner of the property. As far as we can tell, under the terms of the lease petitioner was the owner of the property. It retained legal title to such property, received rental payments on such property and received all proceeds on the sale of such property. See Houchins v. Commissioner,79 T.C. 570, 591 (1982); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237-1238 (1981), and cases cited therein. These are sufficient incidents of ownership to make petitioner responsible for reporting 100 percent of the gain on the sale of such property. Petitioner's interest in the leased property was anything but "infinitesimal." On the other hand, we find no grounds for *91 constructing a hypothetical realization of 50 percent of the sale proceeds by Reading coupled with the creation of ordinary income to petitioner when Reading used such proceeds to pay petitioner's debts. The fact that petitioner and respondent previously agreed that for the years 1967 through 1974 petitioner need only report 50 percent of the gain on sale and that Reading realized the other 50 percent of the gain does not bind us. See Coors v. Commissioner,60 T.C. 368, 406 (1973), affd. sub nom. Adolph Coors Co. v. Commissioner,519 F.2d 1280 (10th Cir. 1975). Similarly, the fact that, after Conrail took all the leased railroad property, petitioner and Reading agreed to sell all remaining nonrail leased property and split the sale proceeds evently does not support respondent's theory that the sales proceeds constitute rental income or income realized through third party debt payment. At the time the lease was frustrated, Reading apparently still would have had use for such nonrail leased property since it had then not yet sold it. Consequently, it was only logical that Reading would demand from petitioner compensation for terminating its leasehold interest in these properties. *92 There is no reason why Reading should receive 50 percent of the sale proceeds of land for which it had no use but on which it was required to pay rent for the next 990 years. In sum, we hold that petitioner realized and was required to report 100 percent of the gain when Reading sold petitioner's leased property in 1975 and 1976. Since all the proceeds were rightfully petitioner's, the use of such proceeds to retire petitioner's mortgages and bonds at full face value had no further tax significance to petitioner. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Although the taxable year 1975 is not before us, resolution of the 1975 issues is necessary to properly compute petitioner's net operating loss carryover deduction for 1976. See section 6214(b). n1a Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the year in issue. All references to Rules are to the Tax Court Rules of Practice and Procedure.↩
2. The amount was calculated to enable petitioner to meet its annual interest obligations on its outstanding bonds and floating debt and to pay a fixed rate of dividends on its capital stock. Provisions in the lease called for the reduction of the rental payments in the event that Reading paid off petitioner's bonds or floating debt.
3. On December 1, 1952, petitioner refinanced $6,000,000 of its outstanding mortgage bonds and entered into a new mortgage. At the same time, Paragraph Thirteenth of the lease was modified slightly. The modified version of Paragraph Thirteenth was to be effective only so long as the December 1, 1952, mortgage was in force. It appears from the lease that this new mortgage was to run until December 1, 1972. Accordingly we assume, and the parties do not contend otherwise, that the text of Paragraph Thirteenth quoted above contains the relevant language in effect in 1975 and 1976 to the extent the lease was effective in those years.↩
4. Contrast United States v. Joliet & Chicago R. Co.,315 U.S. 44 (1942), where the taxpayer railroad, which had leased its property to another railroad in perpetuity (the lease containing no defeasance clause) unsuccessfully argued that the lease vested a fee interest in the lessee and that, consequently, payments by the lessee to the taxpayer's shareholders did not constitute rental income to the taxpayer.
4a. There is nothing in the record to indicate, and petitioner does not contend, that petitioner also accrued and reported such taxes and interest as additional rental income receivable from Reading for 1972 through 1976. See section 1.162-11(a), Income Tax Regs.↩ Such reporting would presumably have created a "wash", thus eliminating the dispute on this issue.
5. Section 1.162-11(a), Income Tax Regs., states, in part: Taxes paid by a tenant to or for a landlord for business property are additional rent and constitute a deductible item to the tenant and taxable income to the landlord, the amount of the tax being deductible by the latter.↩
6. See also the discussion in 1 B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 6.1, p. 6-2 (1981). 7. Respondent does not contend that such accretion to wealth constituted additional rental income, see United States v. Boston & M.R. Co.,279 U.S. 732↩ (1929), presumably because 1) the lease had been neither affirmed nor disaffirmed during the period during which the tax liabilities were accrued and 2) the lease was expressly terminated by the April 1, 1976, agreement.
8. The $2,600,000 advance would be repaid first if petitioner's award exceeded $5,573,425. The total of these two amounts equals $8,173,425.↩
9. Petitioner points out that if respondent's arguments were accepted, it would appear this $2,600,000 loan should also be considered illusory and respondent, to be consistent, should additionally increase petitioner's 1976 income by that amount.↩
10. It has, of course, been held that if a borrower buys back his note at less than the face value, he will realize income at the time of the repurchase. United States v. Kirby Lumber Co.,284 U.S. 1 (1931). See also Commissioner v. Tufts,↩ 641 U.S.     (1983), where the amount realized at the time of the disposition of property included the face amount of the note even though the fair market value of the property securing the note was less than the face of the note.
11. Compare CRC Corp. v. Commissioner,693 F.2d 281 (3d Cir. 1982), and Brountas v. Commissioner,692 F.2d 152 (1st Cir. 1982), revg. on other grounds 73 T.C. 491 (1979); Gibson Products Co. v. United States,637 F.2d 1041 (5th Cir. 1981); Fox v. Commissioner,80 T.C. 972 (1983), on appeal (2d, 3d and 4th Cir., August 10, 1983), where nonrecourse purchase money loans were held to be too contingent to be treated as bona fide loans for purposes of including such loans in basis or deducting interest thereon; Zappo v. Commissioner,81 T.C. 77 (1983), where the substitution of a contingent nonrecourse debt for a recourse debt was insufficient to avert the realization of discharge of indebtedness income on the substitution; and Saviano v. Commissioner,80 T.C. 955 (1983) and Graf v. Commissioner,80 T.C. 944↩ (1983), where deductions were disallowed when paid by way of highly contingent nonrecourse debts.
12. During 1975 and 1976, sections 108 and 1017 provided, in relevant part: SEC. 108. INCOME FROM DISCHARGE OF INDEBTEDNESS. (a) SPECIAL RULE OF EXCLUSION.--No amount shall be included in gross income by reason of the discharge, in whole or in part, within the taxable year, of any indebtedness for which the taxpayer is liable, or subject to which the taxpayer holds property, if-- (1) the indebtedness was incurred or assumed-- (A) by a corporation, or (B) by an individual in connection with property used in his trade or business, and (2) such taxpayer makes and files a consent to the regulations prescribed under section 1017 (relating to adjustment of basis) then in effect at such time and in such manner as the Secretary or his delegate by regulations prescribes. * * * SEC. 1017. DISCHARGE OF INDEBTEDNESS. Where any amount is excluded from gross income under section 108(a) (relating to income from discharge of indebtedness) on account of the discharge of indebtedness the whole or a part of the amount so excluded from gross income shall be applied in reduction of the basis of any property hold (whether before or after the time of the discharge) by the taxpayer during any portion of the taxable year in which such discharge occurred. The amount to be so applied (not in excess of the amount so excluded from gross income, reduced by the amount of any deduction disallowed under section 108(a)) and the particular properties to which the reduction shall be allocated, shall be determined under regulations (prescribed by the Secretary or his delegate) in effect at the time of the filing of the consent by the taxpayer referred to in section 108(a)↩. The reduction shall be made as of the first day of the taxable year in which the discharge occurred, except in the case of property not held by the taxpayer on such first day, in which case it shall take effect as of the time the holding of the taxpayer began.
13. A problem in the lease is its failure to specify who would receive the sale proceeds in the event all of petitioner's mortgages and bonds had previously been retired. This contingency never occurred during the nearly 100 years the lease was in effect. To the extent such fact might be relevant to our determination herein, however, we conclude that petitioner has failed to meet its burden of showing it would not have received all the sale proceeds after all its mortgages and bonds had been retired. Rule 142(a).